Lee A. **EVERHART** et al., **Plaintiffs,**

v.

**DRAKE MANAGEMENT, INC.** et al., **Defendants.**

**UNION COMMERCE, Defendant–Third Party Plaintiff–Appellant,**

v.

**FIREMAN'S FUND INSURANCE CO.** et al., **Defendants–Appellees.**

No. 78–1428.

United States Court of Appeals, Fifth Circuit.

Oct. 8, 1980.

Wilfred C. Varn, Thomas M. Ervin, Jr., Tallahassee, Fla., for plaintiff.

Fowler, White, Gillen, Boggs, Villareal & Banker, W. Donald Cox, Tampa, Fla., for Fireman's Fund Ins.

John K. Folsom, Tallahassee, Fla., for Albert H. Stephens, Rhodes, and Frederick Bryant.

Hall & Booth, J. Lewis Hall, Tallahassee, Fla., for Travelers Indemnity Co. Stephens, Rhodes & Bryant.

Before TUTTLE, BROWN and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Union Commerce Bank (Bank), appeals trial court's grant of summary judgment[1] in favor of insurer, Fireman's Fund Insurance Co. (Insurer), in direct action to recover under terms of blanket bond fidelity

---

1. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof. Fed.R.Civ.P. 56.

insurance contract issued to insured, Commonwealth Corporation (Commonwealth). Bank argues the blanket bond fidelity contract extends coverage to third-party beneficiaries, Florida law strongly favors upholding rights of third-party beneficiaries to insurance contracts, and it is for purposes of the contract a third-party beneficiary. Concluding the fidelity bond does not extend coverage to Bank, we affirm.

### Fireman's Fund Covers Commonwealth With Blanket

In late 1972 and early 1973, Commonwealth, who was engaged in the business of placing, funding, and servicing construction and general mortgage loans arranged two loans in the amounts of $800,000 and $975,-000 for construction of a building project, Part Twenty West.[2] The loans were secured by mortgage notes properly recorded in Leon County, Florida.[3] Joint borrowers were Drake Management, Inc. (Drake) and Commonwealth Capital Corporation (Capital).[4] Funding was initially provided by Bank on May 8, 1973, with the understanding the mortgage notes would be reassigned when permanent investors were found. Commonwealth consequently continued to service the loans.[5]

By the spring of 1974, Commonwealth secured U. S. Life Insurance Company of Texas, North American Life Insurance Company of Chicago, and Old Line Life Insurance Company of America (Life Companies) to act as permanent investors. Closing of this permanent loan was piloted by Commonwealth, and the Life Companies' attorney, Albert H. Stephens of the law firm of Stephens, Rhodes, Bryant, and Dur-

rance.[6] Upon closing, bank forwarded to Stephens the loan packages and executed mortgage reassignments in favor of Commonwealth. Bank also directed Stephens, by letter dated April 19, 1974, they "be held in escrow until Union Commerce Bank received payment in full."

Either unaware of, or momentarily ignoring, this letter, Stephens completed closing of the permanent loan transaction on April 22, 1974, receiving $1,800,000 from the Life Companies. Stephens then issued trust account checks for these funds made payable only to Commonwealth which he delivered to Commonwealth. Commonwealth failed to forward these proceeds to Bank, however, depositing them in a general company account which was at that time in a state of over $5,000,000 book balance overdraft. As a result of this deficit, the funds were ultimately used to pay other corporate obligations of Commonwealth. On June 24, 1974, Commonwealth filed for reorganization under Chapter X of the Bankruptcy Act. Lee A. Everhart (Trustee) was appointed trustee in bankruptcy.

On August 9, 1974, Trustee filed in the District Court actions for interpleader and declaratory judgment against Bank and the Life Companies to ascertain whether payment by Capital as co-mortgagor should be made to the permanent lenders or to the construction lender. Also joined as a defendant were Drake Management and Fred Drake, Jr. for unwillingness to make payments on the project. In response, Bank joined Stephens, his law partners, and their professional errors and omissions insurer, Traveler's Indemnity Company, on Decem-

---

**2.** The loans were closed on October 9, 1972, and January 22, 1973, having maturity dates of December 15, 1974 and March 18, 1974, respectively.

**3.** *See* Fla. Stat. § 701.02 which requires mortgage assignments be placed of record to be effective against creditors.

**4.** Capital was a wholly owned subsidiary of Commonwealth.

**5.** The arrangement was formalized by a Purchase, Repurchase, and Servicing Agreement between Bank and Commonwealth entered into

on May 17, 1973. Addendum I to the Agreement demonstrates the two loans secured from Bank constituted only $1,775,000 of an aggregate $14,099,300 for the eighteen mortgage loans Commonwealth was placing, funding, and servicing.

**6.** During this period Stephens was also Assistant Secretary of Drake Management, Inc., while his law partner, Rhodes, was both Secretary and a Director.

ber 30, 1974. On May 9, 1975, Insurer, which had issued a blanket fidelity bond in favor of Commonwealth and Capital, was joined. Concurrently, Bank counterclaimed against Commonwealth and cross-claimed against all other defendants for the amount owed under the two construction mortgages.

Throughout the duration of 1975, these parties answered Bank's counterclaim and cross-claims, ultimately moving for summary judgment. After oral argument and upon submission of memoranda by the parties, the District Court granted the various motions for summary judgment and entered final judgment on January 4, 1978. Bank appealed, alleging the District Court erred in granting summary judgment in favor of Stephens, Travelers, and Insurer.[7] Subsequent to oral argument, however, Stephens, Travelers, and Bank settled, leaving this Court to determine only whether the Court properly granted summary judgment in favor of Insurer.

Before concluding Insurer was entitled to this judgment as a matter of law, the District Court analyzed Bank's contentions for recovery in light of the following policy language:

[Fireman's Fund] . . . agrees with [Commonwealth] . . . with respect to loss sustained by [Commonwealth] . . . to indemnify and hold harmless [Commonwealth] for:

(a) Loss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others, *including loss, through any such act of any of the Employees of Property held by the Insured for any purpose or in any capaci-*

*ty and whether so held gratuitously or not and whether or not the insured is liable therefor.*

\* \* \* \* \* \*

Section 4. This bond is for the use and benefit only of the insured named in the Declarations and the Underwriter shall not be liable hereunder for loss sustained by anyone other than the insured *unless the insured, in its sole discretion and at its option, shall include such loss in the Insured's proof of loss.* (Emphasis supplied.) . . .[8]

Based on these provisions, the Court found Bank's request for recovery "was not contemplated by the contracting parties and finds no support in law or public policy" and determined "Bank lacks standing . . as a condition precedent to recovery by Bank has not been alleged. . . . "

### Can Bank Get Under The Recovery Blanket?

Bank now argues the Court erred because (i) Commonwealth's employees committed fraudulent acts, (ii) the blanket fidelity bond issued by Insurer extended coverage to third-party beneficiaries, and (iii) as a third-party beneficiary it is entitled to recover under the policy. To support its contentions, Bank cites *Shingleton v. Bussey*, 223 So.2d 713 (Fla.1969), which extended coverage to plaintiff as a third-party beneficiary in a direct action under a motor vehicle liability policy issued by defendant insurer. *Id.* at 717. Citing Florida's strong public policy in favor of upholding rights of third-party beneficiaries to liability insurance contracts[9], Bank urges this Court to

---

7. Bank did not appeal the other summary judgment rulings.

8. The policy defines property as follows:

(b) 'Property' means money (i. e., currency, coin, bank notes, Federal Reserve notes), . . . evidences of debts, . . . checks, . . . mortgages upon real estate and/or chattels and upon interests therein, and assignments of such policies, mortgages and instruments, and other valuable papers, . . . in which the Insured has an interest or which are held by the Insured for any

purpose or in any capacity and whether so held gratuitously or not and whether or not the insured *is* liable therefor."

9. The Florida Supreme Court has held that policies permitting third-party beneficiary suits as in *Bussey* may be extended to other forms of liability insurance. *Beta Eta House Corp., Inc. v. Gregory*, 237 So.2d 163, 165 (Fla. 1970). *See, e. g., Amsler v. American Home Assurance Co.*, 348 So.2d 68 (Fla. App. 1977) (professional insurer of attorney); *School Board of Broward County v. Surette*, 281 So.2d 481 (Fla. 1973)

apply these considerations to blanket bond fidelity insurance policies. Along the way, it contractually distinguishes *American Empire Insurance Co. v. Fidelity and Deposit Co.*, 408 F.2d 72 (5th Cir. 1969).

In contrast, Insurer contends the District Court was correct in granting summary judgment against Bank because (i) Bank lacks standing to bring this action since it is not a named insured on the blanket bond, and (ii) no loss covered under the insuring agreements of the policy has occurred. More specifically, Insurer emphasizes to support its contentions Bank can cite only cases which hold a third party may sue for liability coverage rather than for loss suffered by the named insured. It further claims Commonwealth used the funds to pay legitimate corporate obligations and Bank had no right to payment before any other creditor.

*Bank Can't Be Tucked Under The Blanket*

■ When deciding whether to grant a motion for summary judgment, District Court must view the evidence in a light most favorable to the party resisting the motion. *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83, 85 (5th Cir. 1978); *BAW Manufacturing Co. v. Slaks Fifth Avenue Ltd.*, 547 F.2d 928, 930 (5th Cir. 1977). Thus, the moving party is burdened with establishing the absence of a genuine issue as to material facts. *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980); *Boazman v. Economics Laboratory, Inc.*, 537 F.2d 210, 213 (5th Cir. 1976). Summary judgment may be granted only when the moving party has established his right to judgment with such clarity that the nonmoving party cannot recover (or establish the defense) under any discernible circumstance.

■ Like any contract, insurance policies are construed as a whole. *Burton v. State Farm Fire and Casualty Co.*, 533 F.2d 177, 179, *rehearing denied* 540 F.2d 1084 (5th Cir. 1976); *Moore v. John Hancock Mutual Life Insurance Co.*, 436 F.2d 823, 828 (5th Cir. 1971); *Ellenwood v. Southern United Life Ins. Co.*, 373 So.2d 392, 395 (Fla.App. 1979). The principal consideration is the parties' intention as revealed by the policy's language. *Gulf Oil Corp. v. Mobile Drilling Barge*, 441 F.Supp. 1, 11, *aff'd* 565 F.2d 958, 959 (5th Cir. 1975); *General Accident Fire & Life Assurance Corp. v. Liberty Mutual Insurance Co.*, 260 So.2d 249, 263 (Fla. App. 1972). Nevertheless, if the language of a policy is plain and unambiguous, the words will be given their commonly accepted meaning. *Garcia v. Queen, Ltd.*, 487 F.2d 625, 630 (5th Cir. 1973); *U. S. Liability Insurance Co. v. Bove*, 347 So.2d 678, 680 (Fla. App. 1977). We may not rewrite the contract. *American Empire Insurance Co. v. Fidelity and Deposit Co.*, 408 F.2d 72, 77 (5th Cir. 1969); *Blue Cross v. Dysart*, 340 So.2d 970, 974 (Fla. App. 1976). The coverage of a fidelity bond cannot be extended by implication, or enlarged by construction beyond the actual terms of the agreement entered into by the parties. *Fidelity Deposit Insurance Corp. v. Aetna Casualty and Surety Co.*, 426 F.2d 729, 736 (5th Cir. 1970).

The Court found and Insurer contends Bank lacked standing to bring this action, citing *American Empire*[10] and its line of cases.[11] The language of both the contract and servicing agreements were explicit. No ambiguities were present.

■ As the facts disclose, the policy was made between Insurer and Commonwealth. Bank presented only the policy provision which permitted Commonwealth to extend,

---

(insurer of school board); *Vilord v. Jenkins*, 240 So.2d 68 (Fla. App. 1970) (medical malpractice actions); *Maxwell v. Southern American Fire Insurance Co.*, 235 So.2d 768 (Fla. App. 1970) (contract provisions of medical payment coverage portion of homeowner's insurance policy); *Liberty Mutual Insurance Co. v. Roberts*, 231 So.2d 235 (Fla. App. 1970) (homeowner's policy); *DaCosta v. General Guaranty*

*Ins. Co.*, 226 So.2d 104 (Fla. 1969) (marine indemnity insurance policy).

**10.** 408 F.2d 72 (5th Cir. 1969).

**11.** *I. e., Fidelity and Deposit Co. v. Usaform Hail Pool, Inc.*, 463 F.2d 4 (5th Cir. 1972), and *Fidelity and Deposit Co. v. Usaform Hail Pool, Inc.*, 523 F.2d 744 (5th Cir. 1975).

in its discretion, coverage of the blanket fidelity bond to Bank. No evidence of Commonwealth's exercise of this privilege was presented. Commonwealth did not include any losses to Bank within its proof of loss. A legal liability of Insurer to Bank cannot be predicated on one owed by Commonwealth to Bank. The policy meant what it explicitly stated—only Commonwealth (and such discretionary entities permitted by it) was insured against losses by its employees. If Bank desired coverage, it had the contract right to request a specific and individual bond be purchased running directly for its benefit as provided in the servicing agreement.[12] The language of both the fidelity bond insurance contract and the servicing agreement were implicit in their requirements.[13] No ambiguities were present.

■ Additionally, and even assuming that by some stretch of imagination, legal or otherwise, Bank could step into the shoes of Commonwealth, Bank has not shown how Commonwealth suffered any loss. Commonwealth suffered no increase in lia-

bilities as a result of the permanent investment funds being deposited to a general company account. Commonwealth merely experienced a shifting of liabilities for which it was not entitled to recover against Insurer. *Fidelity and Deposit Co. v. Usaform Hail Pool, Inc.*, 463 F.2d 4, 5 (5th Cir. 1972). Liability of an indemnitor under a fidelity bond does not arise until the indemnitee has suffered a loss within the scope of the coverage. *American Empire*, 408 F.2d at 77.

■ Nor can we hold these conclusions violate any public policy considerations reflected by Florida law.[14] Although Florida has adopted a liberal view extending insurance coverage to third-party beneficiaries in a wide variety of cases, a distinction exists between those cases and the one before us. The blanket fidelity bond issued by Insurer protects against losses sustained by Commonwealth due to fraudulent acts or omissions of its own employees. In contrast, liability insurance protects against claims for losses to persons or property (owned by

**12.** Paragraph 16 of the Purchase, Repurchase, and Servicing Agreement between Commonwealth and Bank provides:

SELLER [COMMONWEALTH] TO MAINTAIN FIDELITY BOND. Seller shall maintain a fidelity bond with broad coverage, in a surety company satisfactory to Buyer [BANK], on all employees handling Buyer's funds, monies, documents, and papers, which bond shall protect Buyer against losses, including theft, embezzlement, fraud and misplacement. *Should Buyer desire a specific and individual bond running directly for its benefit,* Seller will secure said bond, but the cost and expense of such separate bond shall be at the expense and cost of Seller (parentheticals and emphasis supplied).

There is no basis in the record to support a holding (or implication) that the bond-insurance policy was written in response to Par. 16 of the contract. The bond-insurance policy was executed on March 10, 1973 but the Service Agreement was not executed until May 17, 1973.

**13.** Attached to the bond-policy papers as issued was a printed form "Outline of Coverage Financing Companies Blanket Bond, Standard Form No. 15", which made very clear that the coverage was limited to the named insured(s) only with an express denial of third party rights:

It has always been the intent of blanket bond coverage that only the named Insured would have any rights under the bond. To clarify this intent and to avoid any implication that there is any third party coverage given by the bond, this provision provides specifically:

"This bond is for the use and benefit only of the Insured named in the Declarations and the Underwriter shall not be liable hereunder for loss sustained by anyone other than the Insured unless the Insured in its sole discretion and at its option, shall include such loss in the Insured's proof of loss."

Although the form stated "[t]his analysis is intended to be informative only, the terms and provisions of this bond and riders will govern any question arising in connection therewith," this contemporaneous construction, stated by Insurer and obviously known to Commonwealth fortifies our basic conclusion as to the party (or parties) for whose losses the policy was issued.

**14.** Examination of this Court's opinions show we follow the principles adopted in Florida. *See, e. g., Ranger Insurance Co. v. Algie*, 482 F.2d 861 (5th Cir. 1973); *Duke v. Hoch*, 468 F.2d 973 (5th Cir. 1972).

such stranger) not a party to the contract.[15] Liability insurance protects against losses sustained by parties which, although within foreseeable expectation, are not predictable as to person, time, place or nature of occurrence or damage. Fidelity insurance undertakes to protect the assured against loss incurred by the assured or any predetermined specified group. Bank had an opportunity to become a member of this group. *Shingleton v. Bussey* and its line of cases extending coverage under a liability policy is not applicable to fidelity bond contracts where the parties, whose losses are insured, are readily defined, specified and predictable. As a financing institution, Bank entered into the arrangement with Commonwealth well aware of the possible risk that employees of other entities in the handling or mishandling of Commonwealth's property might bring a loss to Commonwealth. Under such circumstances, we echo what we once said, that Bank "walked into this loss with its eyes wide open." *Fidelity and Deposit Co. v. Usaform Hail Pool, Inc.*, 523 F.2d 744, 755 (5th Cir. 1975).

For the same reasons, Bank's assertion Commonwealth employees committed fraudulent acts must also fail. We recognize Commonwealth's insolvency may make illegitimate some disbursements that otherwise might be legitimate. *Fidelity and Deposit Co.*, 523 F.2d at 763. But the simple fact remains that in Commonwealth employees using these funds to pay or cover legitimate corporate obligations, rather than satisfy the moral (legal) obligation to send the funds to Bank, Commonwealth suffered the loss of not a single *sous*. Even if the blanket bond fidelity insurance contract extended to Bank, the coverage was for losses sustained by Commonwealth. Commonwealth could not recover for want of a loss. Bank can get no more.[16]

AFFIRMED.

---

**15.** *Cf. Maryland Casualty Co. v. American Trust Co.*, 71 F.2d 137 (5th Cir. 1934), with *Travelers Indemnity Co. v. Knott*, 114 Fla. 820, 153 So. 304 (1934), which define fidelity and liability, insurance respectively.

---

**16.** Whatever rights Bank might have had against Commonwealth for failure to secure insurance protection to Bank (*see* note 12, *supra*) are not before us and would not affect our decision which rejects expansion of the policies' coverage.