737 P.2d 532

**ANCHOR EQUITIES, LTD.,**
**Plaintiff-Appellant,**

v.

**PACIFIC COAST AMERICAN and**
**James J. Kelly,**
**Plaintiffs-Appellees,**

v.

**SUNWEST FINANCIAL SERVICES, INC., Sunwest Bank of Raton, N.A., United States Fire Insurance Co., Shirley Koenig, Title Services, Inc., Title Escrows, Inc., Alan Edward Clare, the underwriting members of Lloyd's of London, Don Arthur d/b/a Don Arthur Insurance Agency, and Dwight Tope Insurance Agency, Inc., Defendants-Appellees.**

**No. 16672.**

Supreme Court of New Mexico.

May 11, 1987.

Rehearing Denied June 4, 1987.

**752**

James M. Kennedy, P.C., James M. Kenndey, Albuquerque, for appellant.

Keleher & McLeod, Robert Conklin, Albuquerque, for Don Arthur.

Montgomery & Andrews, Robert J. Mroz, Helen L. Stirling, Albuquerque, for US Fire Ins.

**OPINION**

WALTERS, Justice.

Appellee United States Fire Insurance Company (USFI) issued a comprehensive dishonesty, disappearance, and destruction policy to defendant Title Escrow, Inc. That policy, or fidelity bond, was purchased by Title Escrow in compliance with the Escrow Company Act. NMSA 1978, §§ 58–22–2 to 33 (Repl.Pamp.1986).

In June 1985, appellant Anchor Equities, Ltd. (Anchor) transferred $80,254.00 into Title Escrow's trust account. The purpose of the transfer was to provide permanent financing for and improvements on real estate owned by plaintiff James Kelly. (Neither Title Escrow nor Kelly is a party to this appeal.)

Anchor alleged in its complaint that the owner and sole employee of Title Escrow misappropriated and absconded with the funds which it had deposited into Title Escrow's trust account.

Without having first brought suit against Title Escrow or its owner/employ-ee, Anchor asserted a direct cause of action against USFI as issuer of the fidelity bond. Obviously, the insured owner/employee did not, and probably would not, seek recovery on the bond for her own defalcation. USFI answered the complaint, and raised the affirmative defense of failure to state a claim upon which relief could be granted. The trial court granted USFI's motion to dismiss.

Anchor appeals and raises the following issue: Does a fidelity bond, procured by force of legislative enactment, inure to the benefit of the public so as to permit an injured party, other than the named insured, to bring a direct cause of action for damages against the bond issuer?

We hold, particularly under the circumstances of this case, that it does, and we reverse the trial court's order dismissing USFI as a party defendant.

The law governing a direct cause of action against an insurer has been addressed by this Court previously. *See Lopez v. Townsend,* 37 N.M. 574, 25 P.2d 809 (1933); *Breeden v. Wilson,* 58 N.M. 517, 273 P.2d 376 (1954); *England v. New Mexico State Highway Comm'n,* 91 N.M. 406, 575 P.2d 96 (1978).

In *England,* we articulated the following three-part test for determining whether a direct cause of action will be permitted against an insurer:

1) Was the insurance procured by force of legislative enactment?

2) Does the benefit from the purchase of the insurance coverage inure to the benefit of the public? and,

3) Is there anything in the language of the statute which negates the idea of joinder of an insurance company?

*England,* at 408–409, 575 P.2d at 98–99.

USFI urges under *Ronnau v. Caravan Int'l Corp.,* 205 Kan. 154, 468 P.2d 118 (1970) (cited with approval in *New Mexico Livestock Bd. v. Dose,* 94 N.M. 68, 73, 607 P.2d 606, 611 (1980)), that the *England* test should not apply to this case because *Lopez* and its progeny were concerned with direct actions against or joinder of liability insurers, not of fidelity bond issuers.

*Ronnau* is not helpful in the present case because it did not deal with a statute mandating insurance coverage designed to protect the money or property of the public. We do not consider it significant that this is a fidelity bond since, as we stated in *England*, "when insurance coverage is *mandated by the Legislature* the *only* time an insurer *cannot* be joined as a party defendant is when the statute which requires the purchase of insurance negates the idea of such joinder." (Emphasis added.) *England*, 91 N.M. at 408, 575 P.2d at 98. Section 58–22–10 contains no language that would negate the idea of joinder. We see no reason why *England* should not control.

NMSA 1978, Section 58–22–10 (Repl. Pamp.1986), mandates that all escrow companies be "covered by an employee dishonestly bond insuring the escrow company against loss of money or negotiable securities." Therefore, the insurance that Title Escrow purchased was procured by force of legislative enactment, and the first requirement of the *England* test is met.

With reference to *England's* second requirement, USFI maintains that the legislatively-required interest to be protected by the purchase of the fidelity bond is the interest of the insured company itself from the dishonest acts of its employees so that the insured company can continue as a going concern.

We noted in *Breeden* that it is a "meaningless search [to determine whether the coverage inures to the benefit of the public] since the only possible legislative authority to pass such acts or purpose for passing such acts is the protection of the public." *Breeden*, 58 N.M. at 524, 273 P.2d at 380. With regard to fidelity insurance for escrow companies, however, the legislature clearly stated the purpose of the Escrow Company Act in Section 58–22–2, that "[i]t is the intent of the legislature that the large and growing escrow industry be supervised and regulated by the financial institutions division of the commerce and industry department * * * *in order to protect the citizens of the state.*" (Emphasis added.) This language leaves no room for doubt that the purchase of the fidelity bond inures to the benefit and protection of the public.

Finally, the third prong of the *England* test requires that there be nothing in the language of the statute which negates the idea of joinder of the insurance company. If the language of a statute is not specific on allowance of a direct action, "the construction placed upon the language [will be] based largely upon public policy as it is envisaged by the particular court." *Breeden*, at 522, 273 P.2d at 378.

Section 58–22–10 does not specifically allow a direct action against an insurer; nevertheless, the language of Section 58–22–10 does not in any way negate the joinder of the insuring company as a defendant, and the policy behind the statute, *i.e.*, protection of the public, together with the rule of *England*, clearly support a direct action against an insurer.

Consequently, under the holding of *England*, and particularly under the circumstances of the instant case, the trial court's order dismissing USFI as a party defendant must be reversed, and the matter remanded for reinstatement of the complaint.

The costs of this appeal are assessed against USFI. SCRA 1986, 12–403.

IT IS SO ORDERED.

SCARBOROUGH, C.J., SOSA, Senior J., and RANSOM, J., concur.

STOWERS, J., dissents.

STOWERS, Justice, dissenting.

I respectfully dissent. United States Fire Insurance Company (USFI) issued a fidelity bond, not a liability insurance policy, to Title Escrows, Inc. (Title Escrows). While the majority does not consider this distinction significant, it is the fundamental inquiry upon which any relevant analysis must be premised.

The purpose and intent of the fidelity bond issued by USFI was to indemnify Title Escrows against proven losses of money or property through acts of employee dishonesty. The bond did not insure Title Escrows against liability to third par-

ties. Any claim for loss on the bond had to be made by Title Escrows itself, and the benefit of any recovery belonged to Title Escrows, not to the general public.

The majority attempts to methodically apply the three part test developed by the *England* court to the situation here in which a fidelity bond was mandated by the Escrow Company Act, NMSA 1978, Section 58–22–1 to –33 (Repl.Pamp.1986) (the Act). This analysis fails for three reasons.

First, one prong of the *England* test questions whether the benefit from the purchase of insurance coverage inures to the benefit of the public. The majority contends that the fidelity bond requirement pursuant to Section 58–22–10 meets that test. In support of their analysis, the majority cites to one section of the Act regarding the overall intent and purpose of regulating the escrow industry. Admittedly, the State of New Mexico has an interest in regulating the escrow industry and maintaining its orderly business; any legislation imposed by the state is designed to ultimately benefit its citizens. The existence of this statutory protection, however, does not necessarily provide the public with a direct cause of action against the insurer.

The majority's reliance on Section 58–22–2, which states the general purpose of the Act, is misplaced for another reason. The particular section of the Act at issue is entitled "Employee dishonesty bond required." The phrase "employee dishonesty bond" as used in Section 58–22–10 is unambiguous; the type of insurance involved in this section is that of fedility, not liabilty. Under ordinary rules of statutory construction, we must consider the language of an act as a whole and construe each part in connection with every other part so as to produce a harmonious whole. *Atencio v. Board of Educ.,* 99 N.M. 168, 655 P.2d 1012 (1982); *Westgage Families v. County Clerk,* 100 N.M. 146, 667 P.2d 453 (1983). "In interpreting statutes, we seek to give effect to the intention of the Legislature, which is to be determined primarily by the language of the statute itself." *Rutledge v. Fort,* 104 N.M. 7, 9, 715 P.2d 455, 457 (1986). "[W]e will not read into the Act

language which is not there, particularly if it makes sense as written * * *." *Westgate Families v. County Clerk,* 100 N.M. 146, 148, 667 P.2d 453, 455 (1983). "When the words used are free from ambiguity and doubt, no other means of interpretation should be resorted to." *State v. Sinyard,* 100 N.M. 694, 696, 675 P.2d 426, 428 (Ct. App.1983), *cert. denied,* 100 N.M. 689, 675 P.2d 421 (1984). The phrase "employee dishonesty bond" in Section 58–22–10 is unambiguous and should not be construed to include liability coverage.

Finally, while the *England* case involved liability insurance purchased pursuant to the Tort Claims Act, the sole purpose of which was to protect and benefit the public, the purpose of the fidelity bond in the present action was to protect Title Escrows against acts of dishonesty by its employees. There is a well-recognized difference between contracts of indemnity against loss and contracts of indemnity against liability. This significant distinction has been acknowledged in New Mexico as well as several state and federal courts. *See, e.g., New Mexico Livestock Bd. v. Dose,* 94 N.M. 68, 607 P.2d 606 (1980) (the terms of a faithful performance bond providing coverage for loss sustained by the insured through fraudulent or dishonest acts committed by any of its employees are clear and unambiguous and do not provide liability insurance coverage to third parties); *Ronnau v. Caravan Int'l Corp.,* 205 Kan. 154, 468 P.2d 118 (1970) (a fidelity bond is an indemnity insurance contract whereby one for consideration agrees to indemnify the insured against loss arising from the want of integrity, fidelity, or honesty of employees or other persons holding positions of trust; it is direct insurance procured by a company in favor of itself, as contrasted with insurance running to the benefit of members of the public harmed by the misconduct of the covered individual, which bonds are third-party beneficiary contracts); *Fidelity & Deposit Co. v. Smith,* 730 F.2d 1026 (5th Cir.1984) (an insurance company issuing a comprehensive dishonesty, disappearance, and destruction policy is a fidelity insurer of the insured, not a surety of the insured's em-

ployees; further, a fidelity bond is an indemnity insurance contract because the insurer's liability does not arise until the insured had suffered a proven loss); *Hatch v. Reliance Ins. Co.*, 758 F.2d 409 (9th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 571, 88 L.Ed.2d 555 (1985) (a complaint by investors of insured company that insurer negligently issued a fidelity bond was without merit as investors in insured company had no direct claim under the fidelity bond; the bond ran solely to the benefit of the insured company); *175 E. 74th Corp. v. Hartford Accident & Indemnity Co.*, 51 N.Y.2d 585, 435 N.Y.S.2d 584, 416 N.E.2d 584 (1980) (regarding a determination as to whether a fidelity bond was a policy insuring against liability asserted by a third party within the meaning of its statute, the New York Court of Appeals stated that the fidelity bond only covered loss to the insured sustained through the dishonesty of its employees and did not contemplate the assertion of a third-party claim). *See also Kriegler v. Aetna Casualty & Surety Co.*, 108 A.D.2d 708, 485 N.Y.S.2d 1017 (1985); *Foxley Cattle Co. v. Bank of Mead,* 196 Neb. 587, 244 N.W.2d 205 (1976).

These cases reflect the courts' concern with initially determining the kind of insurance purchased by the insured. An insured can certainly invest in liability coverage for its company. If a company has liability insurance, it is protected against third party claims for losses which may be caused by its own acts. However, if an escrow company purchases a fidelity bond, as required by New Mexico statutory law, and an employee commits an act of dishonesty against the company, the escrow company can make a claim under its bond, thereby protecting the security of all other items given to it by members of the public to hold in safekeeping. To allow a direct action on that bond would be to risk losing all of the bond money to the first claimant, thereby potentially putting the escrow company out of business and threatening the loss of all other property held by it. As recognized by the district court in this case, such a result could not have been intended by the Legislature. The court stated:

If we assume a large number of persons who have suffered from the type of dishonesty resulting in loss that is traditionally covered by an employee dishonesty bond, is the first one to the courthouse the one that takes all the money? I don't think the legislature would even listen to that. I think that the legislature * * * in sticking to what appears to be the traditional form of employee dishonesty bond, says once again, "We're going to let the company, the escrow company, determine the loss, make proof of loss, and then recover the funds, and it is these funds that may be subject to judgment at the hands of persons who have been aggrieved." I don't think that with all the experience the legislature has had in mechanics' and materialmen's liens * * * the ranking and priority of nearly every claim that can be made against parties in a number of different circumstances, it's hard to believe that the first person to know about a loss and to run in to get the $100,000.00 that may be available, recovers to the exclusion of the $500,000.00 that have been suffered as a loss by a bunch of other people who have not yet filed in court. I think that the concept that solvency of the company is the basic objective, in the thought that with solvency of the company, there will be protection of the public, probably has not changed.

Because the majority fails to properly recognize the distinction in purpose and coverage between a fidelity bond and a liability insurance policy, I dissent.