SCHOOL EMPLOYEES CREDIT UNION, Plaintiff,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Defendant and Third–Party Plaintiff,

v.

SWINK & COMPANY, INC. et al., Third–Party Defendants.

Civ. A. No. 91–2075–KHV.

United States District Court, D. Kansas.

Nov. 24, 1993.

Lewis A. Heaven, Jr., Holbrook, Heaven & Fay, P.A., Merriam, KS, William C. Partin, Matt Partin, Partin & Partin, P.C., Leon G. Kusnetzky, Leon G. Kusnetzky, P.C., Kansas City, MO, for School Employees Credit Union.

Donald M. McLean, Kansas City, KS, David M. Rhodus, Douglas T. Sloan, Patrick E. Hartigan, Charles M. Thomas, Julie Keith Athey, Paula E. Hosler, Craft, Fridkin & Rhyne, Kansas City, MO, for National Union Fire Ins. Co. of Pittsburgh, PA.

Timothy Gibbons, pro se.

Janet Davis Baker, Overland Park, KS, for Randy Hall.

Jim Swink, pro se.

N. Jack Brown, Boddington & Brown, Chtd., Kansas City, KS, for Frank Scott Eldon Milburn, Violet Ross, Robert Johnson, Jim Tinsley, Bill Kincaid, Lester Lawson,

Gloria Willis, R.W. Raines, William W. Boone, Carol Adam, Jerry McCloud, Reminta King.

Bob Blackwood, pro se.

Morgan Magness, pro se.

Robert Sheddy, pro se.

Gary Granger, pro se.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter is before the court on the motion for summary judgment of defendant/third-party plaintiff National Union Fire Insurance [NUFI] (Doc. # 210), filed March 22, 1993.

School Employees Credit Union [SECU] claims that from October, 1986, to April, 1987, Swink & Company [Swink] made untrue statements and omitted material facts in connection with the purchase and sale of securities, in violation of the Arkansas Securities Act, § 23–42–106 and § 23–42–507. In this suit, SECU seeks to recover the resulting losses under a fidelity bond which NUFI issued to Swink, an Arkansas brokerage firm.

SECU claims that under Arkansas Code Ann. § 23–42–305, it is entitled to bring direct suit against NUFI on Swink's fidelity bond. NUFI disagrees, claiming that it is entitled to summary judgment because neither the fidelity bond, nor any provision of Arkansas law, authorizes direct suit in these circumstances.

### Standard for Granting Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When deciding a summary judgment motion, the court considers all evidence and reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). The nonmoving party

may not simply "rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment accordingly may be entered "against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### Uncontroverted Facts

On May 1, 1986, Swink obtained from NUFI a Securities Dealer Blanket Bond in the amount of $575,000. On November 1, 1986, NUFI renewed the bond, in the amount of $750,000, for a period ending November 1, 1987. The Swink bond was a "fidelity bond" and it was substantially similar, in form, to the Stockbrokers' Blanket Bond promulgated by the Surety Association of America [SAA] in 1986 and 1987. Neither the Swink fidelity bond nor the SAA bond form authorized third parties to bring direct suit against the issuer. Indeed, to the contrary, both the NUFI bond and the SAA bond form expressly stipulated that the bond did not afford direct coverage for such claims. In a provision entitled "LOSS–NOTICE–PROOF–LEGAL PROCEEDINGS," each document contained the following language:

This bond is for the use and benefit only of the Insured named in the Declarations and the Underwriter shall not be liable here under for loss sustained by anyone other than the Insured unless the Insured, in its sole discretion and at its option, shall include such loss in the Insured's proof of loss.

SECU concedes that Swink's fidelity bond does not expressly authorize a direct action against NUFI, but contends that a direct right of action must be *implied* by virtue of Section 305 of the Arkansas Code. At all times material hereto, Section 305(a) required that a broker-dealer of securities in Arkansas post a surety bond. Under Section

305(b)(1), however, broker-dealers who met certain registration and membership requirements could provide a fidelity bond, in a form substantially similar to the SAA brokers' blanket bond, in lieu of posting a surety bond.

Swink met the registration and membership requirements of Section 305(b)(1), and the Arkansas Securities Department determined that Swink qualified for an exemption from the surety bond requirement of Section 305(a). Accordingly, pursuant to Section 305(b)(1), the Department allowed Swink to post the fidelity bond which is at issue in this case.

On March 10, 1989, SECU filed suit against Swink for securities fraud. Shortly thereafter, Swink ceased operations and petitioned for relief under Chapter 7 of the Bankruptcy Code. As a result, effective May 10, 1990, SECU's claims were automatically stayed under Section 362(a) of the Bankruptcy Code. SECU did not pursue its fraud claims against Swink in the bankruptcy court, or in any other forum.[1] Eventually, on August 13, 1991, SECU dismissed its suit against Swink.

On November 30, 1990, SECU demanded that NUFI pay its losses under the Swink bond. NUFI refused, and on March 11, 1991, SECU brought the present action.

### Analysis

As noted above, SECU concedes that Swink's fidelity bond does not authorize direct suit against NUFI. It contends that a direct right of action must be implied, however, under Section 305. As authority for its position, SECU relies almost entirely upon *Foster v. National Union Fire Ins. Co.,* 902 F.2d 1316 (8th Cir.1990), an analogous case decided under Arkansas law. In *Foster,* as here, plaintiffs alleged securities fraud and brought direct suit on a fidelity bond which NUFI had issued to a broker-dealer in Ar-

kansas. The United States District Court for the Eastern District of Arkansas, in an unpublished opinion which relied heavily upon Section 305, allowed the suit. It held that as a matter of public policy, plaintiffs had standing to bring direct suit even though the bond expressly provided otherwise. *Id.* at 1318.

The Eighth Circuit affirmed. In doing so it observed that ordinarily, a fidelity bond is not liability insurance which extends coverage third parties. It also noted that the plain language of NUFI's fidelity bond "would neither allow suit by third parties nor cover their losses." *Id.* at 1319. In the end, however, under a standard of review which the Supreme Court has since repudiated, the Eighth Circuit deferred to the district court's interpretation of Arkansas law. The Eighth Circuit comments in that regard were as follows:

> [W]e give deference to the interpretation of a state law made by a district court sitting in that state ... [and] we will not reverse the district court unless its analysis is 'fundamentally deficient ... without a reasonable basis, or contrary to a reported state court opinion.'

*Id.* at 1318–19 (quoting *McCarthy Bros. Constr. Co. v. Pierce,* 832 F.2d 463, 467 (8th Cir.1987)).

In *Salve Regina College v. Russell,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), decided one year after the Eighth Circuit decision in *Foster,* the Supreme Court held that a court of appeals should review *de novo* a district court's determination of the state law of the state in which it sits. *Id.* at 231, 111 S.Ct. at 1221. In so doing, the Supreme Court noted as follows:

> Independent appellate review of legal issues best serves the dual goals of doctrinal coherence and economy of judicial administration. District judges preside alone over

---

1. SECU did not file a claim with the National Association of Securities Dealers [NASD] "because the NASD claims procedure was not suitable and provided procedures for investigation, discovery, trial and appeal that were inferior to those provided by a lawsuit against Swink." *Addenda to Defendant's Motion for Summary Judgment, or in the Alternative for Partial Summary*

*Judgment* Doc. # 212, App. J, quoting *Plaintiff's Response to Defendant's First Requests for Admissions* at 4–5. SECU did not file a claim with the Securities Investor Protection Corporation [SIPC] "because it determined that SIPC provided no coverage and because it instead filed a lawsuit against Swink." *Id.*

fast-paced trials: of necessity they devote much of their energy and resources to hearing witnesses and reviewing evidence. Similarly, the logistical burdens of trial advocacy limit the extent to which trial counsel is able to supplement the district judge's legal research with memoranda and briefs.

*Id.*[2] In this regard, the Supreme Court stated that "[t]o the extent that the available state law on a controlling issue is so unsettled as to admit of no reasoned divination, we can see no sense in which a district judge's prior exposure or nonexposure to the state judiciary can be said to facilitate the rule of reason." *Id.* at 239, 111 S.Ct. at 1225.

■ A federal district court owes no obedience to the decisions of the courts of appeals in other circuits, though of course it may find their reasons persuasive or be influenced by an accumulation of authority. *In re Korean Air Lines Disaster*, 829 F.2d 1171 (D.C.Cir.1987), *aff'd*, 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989). The Eighth Circuit decision in *Foster* is not binding, however, on this court. Furthermore, especially in view of *Salve Regina*, the decision is not persuasive precedent. While the Eighth Circuit in *Foster* gives lip service to *de novo* review, as an alternative basis for its holding,[3] its independent analysis is neither clear nor persuasive.

■ When called upon to apply state law, federal courts are bound to follow the binding precedents of the highest court of the particular state, just as an inferior court in the state would be bound. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Accordingly, to decide whether SECU may bring direct suit against

NUFI, this court must endeavor to reach the decision that the Supreme Court of Arkansas would reach on these facts.[4] After thoroughly reviewing the law on this issue, this court is convinced that the Arkansas legislature did not intend the result reached in *Foster*, and that the Arkansas Supreme Court would reject the position urged by SECU in this case.

### Fidelity and Surety Bonds Generally

■ Fidelity bonds are different from surety bonds in one respect which is critical to this case: a surety bond indemnifies third parties against losses suffered at the hands of the insured, while a fidelity bond indemnifies the *insured* against losses suffered at the hands of its employees. *E.g., Ronnau v. Caravan Int'l Corp.*, 205 Kan. 154, 159–60, 468 P.2d 118 (1970). Under a fidelity bond, the insurer need not indemnify the insured unless and until the insured has made payment to a third party. *See Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 411–13 (9th Cir.), *cert. denied*, 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 555 (1985) (investors in insured company have no direct claim under a fidelity bond; the bond runs solely to the benefit of the insured company). Fidelity bonds are a form of first party coverage, not a form of third party coverage indemnifying the insured from liability to third persons. *See Three Garden v. United States Fidelity & Guar. Co.*, 318 Md. 98, 567 A.2d 85, 93 (1989). Generally, "a third party which has suffered a loss as a result of the dishonesty of an employee of the insured may not predicate a claim against the fidelity insurer solely on the fact that the dishonesty rendered the insured legally liable to the third party."[5] *Id.*

**2.** The *Salve Regina* Court specifically cited *Foster* as an instance in which the Court of Appeals had deferred to the judgment of the trial court. 499 U.S. at 236–37, 111 S.Ct. at 1223–24.

**3.** In *Foster*, the Eighth Circuit panel noted that while it was reviewing the district court decision with great deference, "[w]e have not, however, failed to closely examine the matter ourselves." *Foster*, 902 F.2d at 1318.

**4.** The Arkansas Supreme Court would not look to an unpublished decision of a federal district court, no matter where it was located, *Aaron v. Everett*, 6 Ark.App. 424, 644 S.W.2d 301, 302

(1982), and even a published federal district court decision would not be binding.

**5.** One case does hold that an injured third party may directly sue the issuer of a fidelity bond. *Anchor Equities, Ltd. v. Pacific Coast American*, 105 N.M. 751, 737 P.2d 532 (1987). In that case, a statute required all escrow companies to maintain "dishonesty bonds" so that—in the words of the statute—"the large and growing escrow industry be supervised and regulated by the financial institutions division of the commerce and industry department ... in order to protect the citizens of the state." *Id.* 105 N.M. at 753, 737 P.2d at 534 (citing N.Mex.Stat.Ann.

## Legislative History

■ The court has examined the legislative history of Section 305, and is convinced that the Arkansas legislature did not intend—by enacting that section—to create by implication a direct right of action on a fidelity bond. Section 305(a) deals with "surety bonds," while Section 305(b) deals with "the standard form of brokers' blanket bond promulgated by the Surety Association of America." Absent clearer evidence on this matter, the court will not presume that Arkansas lawmakers failed to comprehend the critical differences between the two forms of bond or that, by enacting Section 305, they intended to nullify express contractual prohibitions against direct suits on fidelity bonds.

The intent of Section 305 is obvious: to require that broker-dealers who do business in Arkansas maintain some level of financial security, and thereby protect consumers who may be injured by their behavior. As noted above, Section 305(a) generally requires broker-dealers to post a surety bond. Sections 305(a)(1) through 305(a)(4) outline the requirements for surety bonds. Section 305(b), however, provides that a broker-dealer may be exempt from the surety bond requirement in four discrete instances. Section 305(b)(1) allows a qualified broker-dealer to maintain a fidelity bond in lieu of posting a surety bond, and clearly suggests that Arkansas legislature understood the distinction between "fidelity" and "surety" bonds.[6]

The clear intent of Section 305 is to protect members of the investing public from loss due to dishonest or fraudulent conduct by broker-dealers and their employees. A direct cause of action on a fidelity bond is not necessary to effectuate that policy. Section 305(a) requires a surety bond (available to injured third parties) for those broker-dealers that are not sufficiently stable to qualify for membership in the Securities Investor Protection Corporation [SIPC][7] and the National Association of Securities Dealers [NASD].[8] Broker-dealers who are members of SIPC and NASD are automatic recipients of insurance coverage through SIPC and NASD. The State of Arkansas apparently believed that for broker-dealers with demonstrated financial capability to respond to third-party claims—or with guaranteed insurance coverage—the surety bond require-

§ 58–22–10 (Supp.1986)). In *Anchor Equities*, the bond specifically prohibited direct actions and the statute did not explicitly create a right of direct action. The state court nonetheless held that "the policy behind the statute, i.e., protection of the public ... clearly support[ed] a direct action against an insurer." *Id.*

In *Anchor Equities*, the court was constrained by precedent to allow a direct cause of action if (1) the insurance was "procured by force of legislative enactment," (2) the benefit "from the purchase of the insurance coverage inure[d] to the benefit of the public," and (3) no statutory language "negate[d] the idea" of direct action against the insurance company." 105 N.M. at 752, 737 P.2d at 533 (citing *England v. New Mexico State H'way Comm'n*, 91 N.M. 406, 408–09, 575 P.2d 96, 98–99 (1978)). Accordingly, the court in *Anchor Equities* did not inquire into the distinction between fidelity and surety bonds. Once the requirements of *England* were met, it found that the injured third party had standing to sue. *Anchor Equities*, 105 N.M. at 752–53, 737 P.2d at 533–34.

The present case is distinguishable from *Anchor Equities*: the *England* test is not controlling in Arkansas cases, and Section 305 of the Arkansas statute is more ambiguous than the one considered in *Anchor Equities*.

6. The reference to "posting" a surety bond suggests an intent that bond proceeds be available to members of the public, while the reference to "maintaining" a fidelity bond suggests the more self-supporting nature of a fidelity bond. In addition, the fact that Section 305(b) offers "alternatives" to the posting of surety bonds is telling evidence of legislative intent.

7. SIPC was established by the Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78ccc *et seq.* [SIPA]. Under SIPA, all persons registered as brokers or dealers under the Securities Exchange Act and all persons who are members of national securities exchanges are automatically members of SIPC. SIPA also required SIPC to establish a fund from which reimbursements are made to financially injured investors. The primary source of the fund is assessments from SIPC members. *See Id.* § 78ddd(a)(1).

8. NASD is the largest of the industry's self-regulatory mechanisms subject to SEC oversight. Thomas L. Hazen, *The Law of Securities Regulation* 260 (1985). *See also* 15 U.S.C. § 78o–3. NASD has extensive rules governing its members and employees which relate both to standards of conduct and to organizational structure. *See* Hazen, *supra*, at 260.

ment was not necessary.[9]

Detailed review of the legislative history on this point is instructive. In 1959, the Arkansas legislature adopted the Uniform Securities Act. 1959 Ark. Acts 254, § 4(e). What is now Section 305 required broker-dealers and agents to post a "corporate surety bond" and required that the bond authorize direct suits by third parties asserting claims under the civil provisions of the Act. It exempted from the surety bond requirement those broker-dealers who were registered with the Securities and Exchange Commission [SEC] and were members of NASD. The section also exempted from the surety bond requirement dealers in municipal or government securities.

In 1961, the Arkansas legislature amended this section to provide that individual agents and broker-dealers need not post separate surety bonds; broker-dealers were allowed to submit a single surety bond "of the combination or blanket type,"[10] which covered both the broker-dealer and all agents registered to such broker-dealer. 1961 Ark. Acts 248, § 2. The 1961 amendment retained the exemption for broker-dealers in municipal or government securities and for broker-dealers who were registered with the SEC and members of NASD.

In 1973, the Arkansas legislature again amended its statute. This time, while it retained the SEC/NASD exemption, it eliminated the exemption for dealers in municipal and government securities. 1973 Ark. Acts 47, § 4. The amendment also stipulated that in order to qualify for the SEC/NASD exemption, broker-dealers had to be members of, and thus insured by, the Securities Investor Protection Corporation [SIPC].

In 1977, the Arkansas legislature added further conditions to the statutory exemptions from the surety bond requirement. This time, the legislature retained the SEC/NASD/SIPC exemption but, as an additional condition of the exemption, required that each broker-dealer and agent be

> covered by a fidelity bond in a form substantially similar to the standard form of Brokers Blanket Bond promulgated by the Surety Association of America in an amount not less than the required surety bond requirements as provided in this paragraph....

1977 Ark. Acts 493, § 2.[11]

The legislative history of Section 305 makes it clear that from the beginning, Arkansas has exempted certain broker-dealers from the surety bond requirement running in favor of third parties: those dealers either sufficiently stable, from a financial point of view, or sufficiently monitored by government or industrial organizations [SEC, NASD, SIPC], from a regulatory point of view, to ensure a presumptive financial capability to respond to third-party claims. In doing so, the legislature has expressly approved the SAA form of bond, which explicitly prohibits a right of direct action on the bond, in the circumstances present here.

The Arkansas legislature has always intended that different classes of broker-dealers be subject to different rules, based on demonstrated financial capability. The State of Arkansas is entitled to make such decisions, as to matters of public policy. The court presumes that the Arkansas legislature understood the difference between a surety bond and a fidelity bond, and that it appreciated the fact that fidelity bonds do not provide for direct right of action by third parties. *E.g., Everhart v. Drake Management, Inc.*, 627 F.2d 686, 690–91 (5th Cir.1980). Accordingly, the court determines as a matter of law that SECU is not entitled to maintain the present action on Swink's fideli-

---

9. An injured third party may pursue direct claims against NASD and SIPC. SECU may believe that the NASD claim procedure is not "suitable" and that it is procedurally "inferior" to litigation, but the drafters of Section 305(b) apparently believed otherwise. Similarly, SECU's determination that SIPC provided no coverage is immaterial to the question of legislative intent on the direct action issue.

10. The "blanket type" bond is how the insurance industry refers to fidelity guaranty insurance.

11. As noted above, the SAA fidelity bond form to which the statute refers is essentially the form which NUFI used in the instant case. It explicitly states that it indemnifies only the employer or dealer, and that it extends no rights to third-party claimants.

ty bond, and that NUFI is therefore entitled to summary judgment.

For all of the foregoing reasons,

IT IS THEREFORE ORDERED that *NUFI's Motion for Summary Judgment* (Doc. # 210) be and hereby is granted.

## APPENDIX

23–42–305   Corporate surety bonds—Alternatives.

(a)(1) The commissioner shall require registered broker-dealers to post a corporate surety bond in the amount of one hundred thousand dollars ($100,000), registered investment advisers to post a corporate surety bond in the amount of fifty thousand dollars ($50,000), and an agent for the issuer to post a corporate surety bond in the amount of twenty-five thousand dollars ($25,000).

(2) In no event shall the total liability of the surety to all persons, cumulative or otherwise, exceed the amounts specified in the bond.

(3) Every bond shall provide that no suit may be maintained to enforce any liability on the bond unless brought within five (5) years after the sale or other act upon which it is based. (4) Every bond shall provide for suit thereon by any person who has a cause of action under this chapter.

(b) However, in lieu of a corporate surety bond:

(1) A broker-dealer registered with the Securities and Exchange Commission, who is also a member of the National Association of Securities Dealers and a member of the Securities Investor Protection Corporation and whose agents are registered with the National Association of Securities Dealers, may maintain a fidelity bond covering each agent in a form substantially similar to the standard form of brokers' blanket bond promulgated by the Surety Association of America, in the following amounts:

| | |
|---|---|
| Dealer with 1 to 5 agents | $ 40,000 |
| Dealer with 6 to 10 agents | $ 50,000 |
| Dealer with 11 to 15 agents | $ 60,000 |
| Dealer with 16 to 20 agents | $ 70,000 |
| Dealer with 21 to 30 agents | $ 80,000 |
| Dealer with over 30 agents | $100,000 |

and covering, at least, fidelity on premises, in transit, misplacement, forgery and alteration including check forgery, securities loss including securities forgery, and fraudulent trading;

(2) A broker-dealer registered with the Securities and Exchange Commission who is a member of the National Association of Securities Dealers and who operates as a sole proprietor which has no agent other than the sole proprietor shall keep and maintain at least fifty thousand dollars ($50,000) personal net worth evidenced by an annual audited financial statement prepared by an independent certified public accountant and filed with the commissioner; or

(3) Unless the commissioner by rule or order prescribes otherwise, an investment adviser who is registered with the Securities and Exchange Commission, and who does not maintain customer funds, shall keep and maintain at least twenty-five thousand dollars ($25,000) net worth evidenced by an annual audited financial statement accompanied by an opinion acceptable to the commissioner prepared by an independent certified public accountant and filed with the commissioner; or

(4) The commissioner shall accept any appropriate deposit of cash or securities issued by the federal government, the State of Arkansas, or any political subdivision thereof and having a market value of an amount equal to the required corporate surety bond. The deposits of cash and securities shall not be withdrawn until five (5) years after the last effective date of registration or the last effective date for which the deposit was used as a requirement.

(c) The commissioner, in his discretion, has the authority to immediately refund any deposit of cash or securities pledged in lieu of a fidelity bond by a broker-dealer who operates as a sole proprietorship which has no agents other than the sole proprietor and who is registered with the Securities and Exchange Commission and members of the National Association of Securities Dealers

and Securities Investor Protection Corporation.