[No. 58725-6. En Banc. January 21, 1993.]

THE ESTATE OF K.O. JORDAN, ET AL, *Petitioners*, v.
HARTFORD ACCIDENT AND INDEMNITY
COMPANY, *Respondent*.

*B. David Thomas* (of *Windus, Thomas, Calmes & Wiley*) and *Kurt Lichtenberg,* for petitioners.

*John F. Kruger* (of *Karr Tuttle Campbell*), for respondent.

*James J. Purcell* on behalf of Escrow Association of Washington, amicus curiae for petitioners.

JOHNSON, J. — The petitioners seek review of a Court of Appeals decision holding that the respondent insurance company was not liable to the petitioners under the terms of a statutorily mandated fidelity bond. We hold that the insurer

is liable under the bond. We reverse the Court of Appeals and reinstate the superior court judgments.

Lakeside Escrow Corporation (Lakeside) conducted business at several offices in the Puget Sound area. The company was registered under RCW 18.44, the Escrow Agent Registration Act (Act). Pursuant to the Act, Lakeside obtained a fidelity bond from Hartford Accident and Indemnity Company (Hartford). As required by statute, the bond provided fidelity coverage against loss caused by fraudulent or dishonest acts of Lakeside's employees. *See* RCW 18.44.050.

Thomas Tinsley was a shareholder, director, vice-president and employee of Lakeside. Beginning in May 1987, Tinsley embezzled money from the escrow trust account at Lakeside's Bellevue office and diverted the funds into the company's operating account to cover general operating expenses. To cover this embezzlement, Tinsley sometimes shifted money back from the operating account to the trust account. He also submitted false operating reports to the other Lakeside officers.

In December 1987, the Department of Licensing audited Lakeside's trust accounts and discovered Tinsley's thefts. As a result, the Department suspended Lakeside's escrow certificate and the bank froze all of Lakeside's trust accounts. The record reflects that Tinsley embezzled almost $180,000 from the trust accounts. Tinsley was subsequently sentenced to 17 months in prison for embezzling the trust account funds.

Jordan and the other petitioners were customers of Lakeside. Each of them had escrow funds in the Bellevue trust account, and each lost money as a result of Tinsley's thefts. The amounts they lost are:

| | |
|---|---|
| Estate of Jordan | $114,536.16 |
| Stewart and Susan John | 26,276.71 |
| Estate of Rodier | 15,371.24 |
| Pacific Group | 4,287.50 |

Lakeside filed for relief under Chapter 7 of the bankruptcy code. Lakeside's trustee in bankruptcy filed a claim

on Lakeside's behalf against Hartford, alleging that the trust fund losses were covered by the fidelity bond. Hartford denied the claim on two grounds: (1) that Lakeside suffered no actual "loss" from Tinsley's embezzlement because the stolen funds were diverted into the company's general operating account; and (2) that Tinsley's actions were not "fraudulent" within the meaning of the bond.

The Bankruptcy Court entered judgments against Lakeside in favor of the petitioners. The bankruptcy trustee then assigned Lakeside's claim under the bond to the petitioners. The petitioners sued on the bond in the Superior Court for King County. The Superior Court granted the petitioners' motion for summary judgment, ruling that Hartford was liable under the bond.

Hartford appealed the superior court ruling. The Court of Appeals reversed the Superior Court, concluding that Hartford was not liable on the bond because Lakeside suffered no loss. *Estate of Jordan v. Hartford Accident & Indem. Co.*, 62 Wn. App. 218, 813 P.2d 1279 (1991). We granted the petitioners' request for review, and we reverse the Court of Appeals.

This case requires us to interpret a section of the Escrow Agent Registration Act.[1] The Act is a comprehensive scheme that regulates the activities of escrow agents. The section at issue in this case provides:

> At the time of filing an application as an escrow agent, or any renewal or reinstatement thereof, the applicant shall satisfy the director [of licensing] that it has obtained the following as evidence of financial responsibility:
> (1) A fidelity bond . . . covering each corporate officer, partner, escrow officer, and employee . . .
> . . . .
> For the purposes of this section, a "fidelity bond" shall mean a primary commercial blanket bond or its equivalent . . . . Such bond shall provide fidelity coverage for any fraudulent or dishonest acts committed by any one or more of the employees or officers as defined in the bond, acting alone or in collusion with others. Said bond shall be for the sole benefit of the escrow agent and under no circumstances whatsoever shall the bond-

---

[1] RCW 18.44, enacted by Laws of 1965, ch. 153, § 5.

ing company be liable under the bond to any other party. The bond shall . . . protect the [escrow agent] against the loss of money or other real or personal property belonging to the [escrow agent], . . . or for which the [escrow agent] is legally liable or held by the [escrow agent] in any capacity . . ..

RCW 18.44.050.

The parties present two issues for resolution: (1) did the embezzlement from the trust accounts cause a loss to Lakeside within the meaning of RCW 18.44.050 and the bond?; and (2) was Tinsley's embezzlement of almost $180,000 from the trust account a "fraudulent or dishonest" act within the meaning of RCW 18.44.050 and the bond? We answer both questions in the affirmative.

## I

As a preliminary matter, we first address the issue of whether Jordan and the other petitioners[2] have standing to sue under the fidelity bond. The bankruptcy trustee explicitly assigned Lakeside's cause of action under the bond to Jordan. Jordan then asserted a claim as assignee of Lakeside. An assignee steps into the shoes of the assignor, and has all of the rights of the assignor. *Morse Electro Prods. Corp. v. Beneficial Indus. Loan Co.*, 90 Wn.2d 195, 198, 579 P.2d 1341 (1978). The assignee's cause of action is direct, not derivative. *See Oklahoma Morris Plan Co. v. Security Mut. Cas. Co.*, 455 F.2d 1209, 1212 (8th Cir. 1972) (successor to named party succeeds to that party's right to sue under fidelity bond); *Federal Deposit Ins. Corp. v. National Sur. Corp.*, 425 F. Supp. 200, 203 (E.D.N.Y. 1977) (trustee in bankruptcy has direct claim against bonding company). Because Jordan, as assignee, stands in the shoes of Lakeside and has all of Lakeside's rights under the bond, Jordan may assert Lakeside's cause of action under the bond.

Nonetheless, Hartford argued before the Court of Appeals that the bankruptcy trustee did not have the authority to assign Lakeside's rights under the bond to Jordan, and that Jordan therefore lacks standing to bring a cause of action

---

[2]Hereinafter referred to collectively as "Jordan".

under the bond. To support its argument, Hartford relied on the following language in RCW 18.44.050:

> Said bond shall be for the sole benefit of the escrow agent and under no circumstances whatsoever shall the bonding company be liable under the bond to any other party.

According to Hartford, this language prohibits assignments of rights under the bond.

■ The Court of Appeals ruled that the trustee had the authority to assign Lakeside's action to Jordan, and that Jordan has standing to assert the action against Hartford. *Estate of Jordan*, 62 Wn. App. at 224. Hartford did not cross-appeal this holding and did not address the assignability issue in its answer to Jordan's petition for review. A respondent must raise in its answer any issue that it wishes this court to address. RAP 13.4(d). The court will normally not review any issues not presented in the petition for review or the answer. RAP 13.7(b); *see also Honcoop v. State,* 111 Wn.2d 182, 193, 759 P.2d 1188 (1988) (respondent's failure to assign error to a Court of Appeals holding means that the propriety of that holding is not before the Supreme Court); *Clam Shacks of Am., Inc. v. Skagit Cy.,* 109 Wn.2d 91, 98, 743 P.2d 265 (1987) (court rejected argument that an appeal of part of a Court of Appeals decision amounts to a request to review every aspect of that decision). Because Hartford failed to assign error to the Court of Appeals ruling that Jordan has standing, we will not review that aspect of the court's decision.[3]

---

[3]Even if we were to review the standing question, Hartford's arguments are unpersuasive. Rights under fidelity bonds are generally assignable. *See, e.g., Oklahoma Morris Plan Co. v. Security Mut. Cas. Co.,* 455 F.2d 1209 (8th Cir. 1972); *Gillette Co. v. Travelers Indem. Co.,* 365 F.2d 7 (7th Cir. 1966). The plain language of RCW 18.44.050 does not explicitly prohibit assignment. The statute only prohibits direct third party claims against the bond. *Cf.* Wildau, *Evolving Law of Third-Party Claims Under Fidelity Bonds: When Is Third-Party Recovery Allowed?,* 25 Tort & Ins. L.J. 92, 94 (1989-1990) (interpreting similar language in standard form blanket bond as being intended to prohibit direct third party claims). The statute simply does not address the insured's power of assignment.

Furthermore, as the Court of Appeals noted, if we interpret RCW 18.44.050 as prohibiting assignment by bankruptcy trustees, that statute might be in direct conflict with federal bankruptcy law. *See Estate of Jordan,* 62 Wn. App. at 224.

## II

The next question is whether Tinsley's embezzlement of the trust account funds resulted in a "loss" within the meaning of the statute. According to Hartford, Lakeside suffered no loss even though Tinsley embezzled almost $180,000 from the trust account. Hartford argues that because Tinsley diverted the embezzled funds into another Lakeside account, there was no diminution of Lakeside's total assets and therefore no loss to Lakeside.

Jordan argues that Tinsley's embezzlement resulted in a covered loss. We agree. The fidelity bond insured "against loss of money or other property which the Insured shall sustain." Under the statute, that bond must protect

> against the loss of money or other real or personal property . . . for which the obligee is legally liable or held by the obligee *in any capacity* . . ..

(Italics ours.) RCW 18.44.050. Tinsley embezzled money that Lakeside held in its capacity as trustee of the escrow funds. Because of Tinsley's embezzlement, Lakeside was unable to fulfill its obligations as trustee. Lakeside thus suffered a loss in its capacity as trustee, and this loss is covered under the statute.

Neither RCW 18.44.050 nor the bond defines "loss". In reaching the conclusion that the embezzlement resulted in a covered loss, we start with two principles of construction. First, ambiguous terms in bonds are construed in favor of coverage. *White & Bollard, Inc. v. Standard Accident Ins. Co.,* 175 Wash. 174, 181, 27 P.2d 123 (1933); *Puget Sound Nat'l Bank v. St. Paul Fire & Marine Ins. Co.,* 32 Wn. App. 32, 46, 645 P.2d 1122, *review denied,* 97 Wn.2d 1036 (1982). Second, we interpret statutorily mandated bonds in light of the requirements of the relevant statute. *State ex rel. Tollefson v. Novak,* 7 Wn.2d 544, 552, 110 P.2d 636 (1941).

> [T]he rule is that the provisions of the statute pursuant to which a bond is given . . . are considered part of it. . . . Conditions repugnant to the statute will be treated as surplusage, and statutory provisions which are not expressed in the bond will be inserted therein.

(Citations omitted.) *Tollefson,* 7 Wn.2d at 552-53; *see also* 13 R. Anderson, *Couch on Insurance* § 46.21, at 30-31 (2d ed. 1982). Furthermore, in interpreting a statutory bond, we consider *all* of the provisions of the relevant statute. *Paulsell v. Peters,* 9 Wn.2d 599, 611-12, 115 P.2d 708 (1941); *cf. Tommy P. v. Board of Cy. Comm'rs,* 97 Wn.2d 385, 391, 645 P.2d 697 (1982) (court should interpret statute so as to give effect to legislative intent as expressed in the statute as a whole). Therefore we consider all of the provisions of the Escrow Agent Registration Act in determining what "loss" the statutorily mandated bond covers.

When read in its entirety, the Act reflects a legislative intent to protect clients of escrow agents. RCW 18.44.040 requires each applicant for registration as an escrow agent to file proof of honesty, credit and character reports, and to reveal any criminal convictions that are related to the duties of an escrow agent. The Act requires segregation of escrow funds and creates detailed regulations governing the disbursement of those funds. RCW 18.44.070. Violation of the segregation requirement may subject the violator to criminal penalties and is grounds for suspending or revoking the escrow agent's license or registration. RCW 18.44.070; RCW 18.44.260. The Act requires that every escrow office have a licensed escrow officer who has passed an exam and has shown an understanding of the obligations between a principal and an agent. RCW 18.44.200; RCW 18.44.240. The escrow officer must supervise all escrow transactions. RCW 18.44.200. Finally, RCW 18.44.050 requires the escrow company to obtain a fidelity bond "as evidence of financial responsibility".

These requirements reveal that the overall purpose of the Act is to regulate escrow agents for the benefit of the public. Nonetheless, Hartford argues that the language of RCW 18.44.050 establishes that the intent of the bond requirement is *solely* to protect the escrow agents. We do not agree. We must give effect to the legislative intent of the Act as a whole. *Tommy P.,* 97 Wn.2d at 391. The intent of the Act is to protect the public. We must keep that overall intent in

mind when interpreting RCW 18.44.050. Furthermore, RCW 18.44.130 supports the proposition that the fidelity bond requirement is not solely for the benefit of the agent. RCW 18.44.130 requires any agent whose registration expires to notify all principals to preexisting escrows of the condition of the agent's fidelity bond. If the bond were required solely as a means of protecting the agent, then there would be no need to notify parties to escrow agreements of the condition of the bond. This is evidence of a legislative intent to require agents to obtain bonds as a means of protecting the trust beneficiary. We must interpret "loss" in a way that furthers this legislative intent. Therefore we conclude that Tinsley's embezzlement of $180,000 from the trust account constitutes a loss of funds that Lakeside held in its capacity as trustee of the escrow funds. The loss resulted in Lakeside being unable to fulfill its legal obligations as trustee, and that loss is a "loss" within the meaning of the statute and the bond.[4]

The Court of Appeals, however, agreed with Hartford that Lakeside suffered no "loss" within the meaning of the bond or the statute. *Estate of Jordan*, 62 Wn. App. at 225. The court determined that Tinsley's embezzlement did not result in an actual loss to Lakeside, and therefore Hartford has no liability under its bond. To support its conclusion, the Court of Appeals relied primarily on two cases from the Fifth Circuit: *Fidelity & Deposit Co. v. USAFORM Hail Pool, Inc.*, 463 F.2d 4 (5th Cir. 1972) and *Everhart v. Drake Mgt., Inc.*, 627 F.2d 686 (5th Cir. 1980). *See Estate of Jordan*, 62 Wn. App. at 224-25. The court failed to recognize,

---

[4]Hartford argues that this holding would result in a windfall to Lakeside. According to Hartford, Lakeside will get the benefit of using the trust funds to pay its corporate obligations and then using the bond to avoid liability to Jordan. Hartford concludes that this holding would "encourage employees of failing financial institutions to unlawfully divert funds from one company account to another." Brief of Appellant, at 37. Hartford's argument misses a key point: the diversion of such funds is a criminal offense. In this case, Tinsley is now a convicted felon sentenced to 17 months in prison for embezzlement. It is doubtful our holding will encourage employees to engage in acts that could result in being sentenced to prison.

however, that the Fifth Circuit cases are based on reasoning that this court rejected over 50 years ago.

In *White & Bollard, Inc. v. Standard Accident Ins. Co.,* 175 Wash. 174, 27 P.2d 123 (1933), an employee of a loan agent stole client money for her own use. The original theft occurred prior to the beginning of the bond coverage. The employee then diverted funds from various client accounts to other client accounts in order to cover up the original shortage. There was no diminution of the bank's assets during the term of the bond. Thus the issue in the case was whether the shifting of funds from one account to another amounted to a loss within the meaning of the bond. This court concluded that wrongfully diverting the money was a misapplication of funds that amounted to a loss. *White & Bollard,* 175 Wash. at 181. The court reasoned that

> [t]o say that the transaction involved no pecuniary loss to the [insured], such as would entitle it to recover from [the insurer] under its bond, implies too narrow and technical a view of the contract made by the parties. Fidelity bonds, being contracts of indemnity against loss, are to be liberally construed in favor of the object sought to be obtained.

*White & Bollard,* 175 Wash. at 181. The court thus held that crediting the money to the wrong account was a loss within the meaning of the bond. 175 Wash. at 181. *See also Pacific Cy. ex rel. Hamilton v. Continental Cas. Co.,* 184 Wash. 521, 51 P.2d 1078 (1935) (county treasurer's shifting of funds to cover prior shortage was breach of duty covered by bond).

Despite the clear holding of *White & Bollard*, the Court of Appeals ruled Lakeside suffered no loss. That court relied on *USAFORM* and *Everhart*.

In *Everhart*, the Fifth Circuit stated in dicta that moving funds from one corporate account to another is a "shifting of liabilities" and not a loss covered under a fidelity bond. 627 F.2d at 691. The court based that dicta on its earlier holding in *USAFORM*. The court in *USAFORM* relied primarily upon *Continental Cas. Co. v. First Nat'l Bank of Temple*, 116 F.2d 885 (5th Cir.), *cert. denied*, 313 U.S. 575, 85 L. Ed.

1533, 61 S. Ct. 1087 (1941).[5] Our Court of Appeals opinion in the case before us thus ultimately rests on *Continental Casualty*.

The facts in *Continental Casualty* are similar to those in *White & Bollard*. Employees of a bank diverted funds from client accounts and the bank suffered an actual loss. As in *White & Bollard*, that loss occurred prior to the effective date of the bond. Thus the issue before the court was the same as in *White & Bollard*: whether the employees' subsequent shifting of funds from one account to another for the purpose of covering the earlier shortages amounted to a loss within the meaning of the bond. The court held there was no loss because the bank's assets were not diminished. *Continental Casualty*, 116 F.2d at 887. The court cited no authority to support that proposition.

This court's holding in *White & Bollard* directly conflicts with the Fifth Circuit's holding in *Continental Casualty*. *White & Bollard* thus undermines the persuasive value of later Fifth Circuit cases that rely upon *Continental Casualty*. Therefore our Court of Appeals' reliance on those cases was misplaced.[6] The reasoning of *White & Bollard* is as sound today as it was in 1933, and we find that reasoning controlling. Tinsley's misappropriation of trust funds resulted in a loss within the meaning of the bond.

We emphasize that our holding is based on the special trust relationship that exists between an escrow company

---

[5]The Fifth Circuit also cited *In re Schluter, Green & Co.*, 93 F.2d 810 (4th Cir. 1938). In *Schluter, Green & Co.*, an employee diverted funds from customer accounts into the company's general account. The Fourth Circuit ruled there was no loss because there was no diminution of the company's assets. 93 F.2d at 812. The court cited no authority in support of that holding. For the reasons explained in our discussion of *Continental Casualty*, the holding in *Schluter, Green & Co.* has little persuasive value.

[6]The Court of Appeals cites one Washington case, *Puget Sound Nat'l Bank v. St. Paul Fire & Marine Ins. Co.*, 32 Wn. App. 32, 645 P.2d 1122, *review denied*, 97 Wn.2d 1036 (1982), as supporting its holding. *Puget Sound Nat'l Bank* stands for the general principle that a fidelity bond covers only actual losses. 32 Wn. App. at 45. The case does not, however, supply a definition of "loss". Nothing in that case conflicts with our holding today.

and its trust beneficiaries. Lakeside held the escrow funds in trust for the benefit of its clients. A trustee owes undivided loyalty to the beneficiary of the trust. *In re Estate of Johnson,* 187 Wash. 552, 554, 60 P.2d 271, 106 A.L.R. 217 (1936); *see also* G. Bogert, *Trusts and Trustees* § 543, at 56 (2d rev. ed. Supp. 1992) (duty of loyalty applies to most fiduciaries, including agents). It is a violation of the Escrow Agent Registration Act for an agent to convert trust money to his own use or to the use of his principal. RCW 18.44.260. Tinsley's embezzlement violated the Act and his duties as trustee, and resulted in a loss of money that Lakeside held in its capacity as trustee. This constitutes a loss within the meaning of the statute.

### III

The next issue is whether Tinsley's embezzlement of the trust funds is a "fraudulent or dishonest" act within the meaning of the statute. We hold that it is.

RCW 18.44.050 requires escrow companies to obtain fidelity bonds that provide coverage "for any fraudulent or dishonest acts committed by any one or more of the employees or officers as defined in the bond, acting alone or in collusion with others." The bond Lakeside obtained from Hartford covered "loss of money or other property which the Insured shall sustain resulting directly from one or more fraudulent or dishonest acts of an Employee, acting alone or in collusion with others." Clerk's Papers, at 10. Neither the statute nor the bond define "fraudulent or dishonest acts".

We look to standard English language dictionaries for the meaning of undefined terms in insurance policies. *Boeing v. Aetna Cas. & Sur. Co.,* 113 Wn.2d 869, 877, 784 P.2d 507, 87 A.L.R.4th 405 (1990). A fraudulent act is synonymous with a deceitful act. *See Webster's Third New International Dictionary* 904 (1986). An act is dishonest if it involves a breach of trust or honesty. *See Webster's Third New International Dictionary* 650 (1986).

Tinsley embezzled money from Lakeside's trust accounts. In an effort to avoid detection, he occasionally

shifted money back from the general operating account to the trust account, and he filed false operating reports. Tinsley's acts were deceitful and breached the trust of Lakeside's clients. His acts were clearly fraudulent and dishonest within the meaning of the bond and the statute.

The court's reasoning in *Hanson PLC v. National Union Fire Ins. Co.*, 58 Wn. App. 561, 794 P.2d 66 (1990) supports this conclusion. The fidelity bond at issue in *Hanson PLC* contained language virtually identical to the language in Lakeside's bond. The court in *Hanson PLC* determined that a fraudulent or dishonest act is any act "showing a want of integrity or a breach of trust, or an abstraction of funds, together with deceit and concealment." 58 Wn. App. at 570. Tinsley's acts fit that definition. His embezzlement showed a want of integrity and a breach of client trust. He acted deceitfully and attempted to conceal his embezzlement. Therefore Tinsley's acts were fraudulent and dishonest.

Under a plain reading of the statute, the bond covers Tinsley's acts. The statute mandates that the bond provide coverage against the loss of money caused by "*any* fraudulent or dishonest acts committed by any one or more of the employees or officers . . .." (Italics ours.) RCW 18.44.050. Tinsley's acts were fraudulent and dishonest and caused a loss of money. Pursuant to this statutory mandate, the bond must cover Tinsley's embezzlement.

Hartford nonetheless argues that the bond does not cover Tinsley's acts. Hartford focuses on the following passage from the statute:

> [The] bond shall provide fidelity coverage for any fraudulent or dishonest acts committed by any one or more of the employees or officers *as defined in the bond*, acting alone or in collusion with others.

(Italics ours.) RCW 18.44.050. According to Hartford, the phrase "as defined in the bond" allows the insurer to define the term "fraudulent or dishonest acts". Hartford asserts that the bond agreement it had with Lakeside does define that term, and that Tinsley's acts do not meet the bond's definition.

 We reject Hartford's argument for two reasons. First, the phrase "as defined in the bond" modifies only the words "employees or officers". The statute allows the insurer to define who qualifies as an employee or officer; the statute does not allow the insurer to define what is a fraudulent or dishonest act. The bond itself provides evidence that this is the correct interpretation of the statute. The terms of the bond specifically define who is a covered employee. See Clerk's Papers, at 10. The bond provides no definition, however, for the term "fraudulent or dishonest acts".

Second, Hartford's argument would require us to interpret the bond as limiting the statute's coverage requirements. Hartford bases its contention that Tinsley's acts are not covered on the following language from the bond:

> Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent:
> (a) to cause the Insured to sustain such loss; and
> (b) to obtain financial benefit for the Employee, or for any other person or organization intended by the Employee to receive such benefit, [other than normal employee benefits].

Clerk's Papers, at 10. Hartford maintains that the above passage defines "fraudulent or dishonest acts" in a way that does not cover Tinsley's embezzlement of the trust funds.

This passage does not, however, *define* what constitutes a "dishonest or fraudulent" act. Instead, the passage purports to limit the *type* of fraudulent or dishonest acts the bond covers. The bond attempts to limit coverage to only those fraudulent or dishonest acts that were committed with the specific intent listed in the bond. The statute, however, requires that the bond cover "*any* fraudulent or dishonest acts" that result in a loss. (Italics ours.) RCW 18.44.050. Thus the bond's attempt to limit the scope of the coverage conflicts with the plain language of the statute.

 If we accepted Hartford's argument, we would be allowing the insurer to provide less coverage than mandated by statute. This we cannot do. We must interpret the bond to cover all of the circumstances covered by the statute. *See Tollefson*, 7 Wn.2d at 552-53. Accordingly, the bond

must cover *all* fraudulent and dishonest acts of employees that result in a loss to the insured. The bond's restrictions on which acts are covered conflict with the statute, and we must therefore give no effect to those restrictions. *See State Farm Gen. Ins. Co. v. Emerson,* 102 Wn.2d 477, 481, 687 P.2d 1139 (1984) (court will not enforce a limitation in an insurance contract where that limitation is contrary to the provisions of a statute); *Tollefson,* 7 Wn.2d at 552-53 (conditions in a bond that are repugnant to the statute will be treated as surplusage); 13 R. Anderson, § 46.274, at 198 (a bond's exceptions do not relieve the insurer of liability if the exceptions conflict with statutory requirements). The bond therefore covers Tinsley's actions.[7]

Even if we were to accept Hartford's argument that the language of the bond can limit the statutorily mandated coverage, we would still be required to find that the bond covers Tinsley's acts. Hartford interprets the bond as covering actions committed by Tinsley with the "manifest intent" to cause Lakeside to sustain a loss and to obtain a financial benefit for Tinsley.

■ A person acts with manifest intent when he or she desires to achieve the particular consequences of the act *or* knows that the consequences are substantially certain to follow from the act. *Hanson PLC,* 58 Wn. App. at 571-72 (interpreting identical language in a fidelity bond); *Bradley v. American Smelting & Ref. Co.,* 104 Wn.2d 677, 682, 709 P.2d 782 (1985). The actor does not have to desire the particular consequences in order for the court to find intent. *Bradley,* 104 Wn.2d at 682.

---

[7]Hartford cites several cases from other jurisdictions in support of its contention that the bond's manifest intent requirement "significantly narrows the range of conduct covered by the standard fidelity bond." See Brief of Appellant, at 38-42. The issue in this case is not, however, whether the intent requirement limits the coverage of a "standard fidelity bond". The issue is whether the terms of the bond can limit the coverage to less than that required by the statute. None of the cases Hartford cites involve statutorily mandated bonds. Those cases are therefore of little relevance in interpreting the requirements of RCW 18.44.050.

> If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.

*Bradley*, 104 Wn.2d at 682 (quoting Restatement (Second) of Torts § 8A, comment *b*, at 15 (1965)). Thus Tinsley acted with manifest intent within the meaning of the bond because he knew that his embezzlement of funds from the trust account was substantially certain to result in a loss to Lakeside in its capacity as trustee, and in a benefit to himself.

Tinsley's conviction for embezzlement further indicates that he acted with intent to cause a loss.[8] His conviction for embezzlement necessarily includes a determination beyond a reasonable doubt that Tinsley acted to deprive the rightful owner of the money. His occasional replacement of stolen trust funds does not change this analysis. The fact that he replaced some of the embezzled funds merely evidences a desire to not have his thefts discovered; it does not show that he lacked the intent to cause a loss. *Cf. State v. Nicely*, 171 Wash. 439, 446, 18 P.2d 503 (1933) (intent to return stolen funds is no defense to the crime of embezzlement); G. Bogert, *Trusts and Trustees* § 543, at 56 (2d rev. ed. Supp. 1992) (a trustee who engages in self-dealing breaches his or her duty of loyalty even where there is no loss to the trust); 90 C.J.S. *Trusts* § 270b, at 349 (1955) (mingling of trust funds with trustee's private funds breaches duty of loyalty even though trustee eventually replaces the funds and trust suffers no loss).

Tinsley's embezzlement resulted in a loss to Lakeside in its capacity as trustee. It is difficult to imagine how Tinsley could have embezzled the money without knowing that his actions were substantially certain to lead to a loss to Lakeside. Therefore he acted with manifest intent within the

---

[8] A person is guilty of embezzlement when he or she wrongfully obtains or exerts unauthorized control over the property of another with intent to deprive the owner of such property. RCW 9A.56.020.

meaning of the bond even if he did not desire the resulting loss. *See Bradley*, 104 Wn.2d at 682.

Hartford also argues that Tinsley did not embezzle the trust funds for the purpose of obtaining a financial benefit for himself. The bond purports to cover only "dishonest or fraudulent acts committed by [an] Employee with the manifest intent . . . to obtain financial benefit for the Employee . . . other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment." Clerk's Papers, at 10. Hartford argues that Tinsley did not embezzle the funds with a manifest intent to obtain a financial benefit other than "employee benefits earned in the normal course of employment."

Tinsley embezzled money from the trust account in order to cover the general operating expenses of Lakeside. Among those expenses were several Lakeside debts for which Tinsley was personally liable. See Declaration of Joann Rutan; Clerk's Papers, at 46-47. Thus the record supports the inference that Tinsley's theft helped him to pay Lakeside debts for which he would otherwise be personally liable. Furthermore, his embezzlement helped keep Lakeside afloat, and benefited Tinsley in his role as a shareholder of that company.[9] Tinsley's theft of the trust funds therefore provided him a financial benefit other than his normal employee benefits. The bond covers the loss resulting from that embezzlement.

## IV

Jordan requests an award of attorney fees on appeal pursuant to our recent ruling in *Olympic S.S. Co. v. Centen-*

---

[9]Hartford argues that any benefit Tinsley received as a shareholder is irrelevant. Hartford reasons that the bond only covers losses caused by employees, and therefore any benefit Tinsley received must be analyzed from the perspective of Tinsley as an employee. The plain language of the bond defeats Hartford's argument. The bond covers losses resulting from dishonest acts committed by an employee with the manifest intent to "obtain a financial benefit . . . *other than . . . employee benefits* earned in the normal course of employment." (Italics ours.) Clerk's Papers, at 10. Any benefits Tinsley received as a shareholder are clearly benefits "other than employee benefits".

*nial Ins. Co.,* 117 Wn.2d 37, 811 P.2d 673 (1991). In *Olympic Steamship* we held that

> an award of fees is required in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract . . ..

117 Wn.2d at 53. Hartford argues that *Olympic Steamship* only allows awarding attorney fees to an insured and not to the insured's assignee. However, Hartford cites no authority for this proposition. We hold that Jordan is entitled to reasonable attorney fees in an amount to be determined by the Supreme Court commissioner pursuant to RAP 18.1(f).

CONCLUSION

Tinsley's embezzlement of the trust account funds was a fraudulent act within the meaning of the bond and the statute. That embezzlement resulted in a loss to Lakeside. Hartford is liable for that loss. We reverse the Court of Appeals and reinstate the superior court judgments.

DORE, C.J., and UTTER, BRACHTENBACH, DOLLIVER, SMITH, and GUY, JJ., concur.

ANDERSEN, J. (concurring in part, dissenting in part) — By awarding attorney fees in the absence of any contractual, statutory or recognized equitable ground for the award, the majority opinion perpetuates an error begun in the recent opinion of *Olympic S.S. Co. v. Centennial Ins. Co.,* 117 Wn.2d 37, 52-53, 811 P.2d 673 (1991).

In my view, the holding in *Olympic Steamship* was an unwarranted rejection of the American rule on attorney fee awards — a rule this court has followed since its earliest days,[10] and a rule which has generally been the law in the United States for more than 200 years.[11]

---

[10]*See, e.g., Potwin v. Blasher,* 9 Wash. 460, 465, 37 P. 710 (1894); *Larson v. Winder,* 14 Wash. 647, 45 P. 315 (1896).

[11]*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 44 L. Ed. 2d 141, 95 S. Ct. 1612 (1975).

Because I believe that sound judicial practice requires us to rethink and then to overrule *Olympic Steamship*, I cannot agree that it represents a reasonable basis for granting fees in this case. For that reason, I dissent from the award of actual attorney fees.

Until this court's decision in *Olympic Steamship*, the law in this state on attorney fees was consistent and clear; a recognized basis had to exist before such fees could be awarded.[12]

"The most careful and detailed early analysis of the American rule in the State of Washington is found in *[State ex rel.] Macri v. Bremerton*, 8 Wn.2d 93, 111 P.2d 612 (1941)." Talmadge, *The Award of Attorneys' Fees in Civil Litigation in Washington*, 16 Gonz. L. Rev. 57, 60 n.13 (1980) (hereinafter referred to as Talmadge). In *Macri* this court held:

> In absence of contract, statute, or recognized ground of equity, a court *has no power* to award an attorney's fee as part of the costs of litigation.

(Italics mine.) *Macri*, 8 Wn.2d at 113-14.

The equitable grounds upon which an award of fees may be based are (1) bad faith conduct of the losing party; (2) preservation of a common fund; (3) protection of constitutional principles, and (4) private Attorney General actions.[13]

This court's failure to adhere to its own pronouncements of law violates longstanding principles of stare decisis and "create[s] a feeling of general uncertainty as to the reliance which may be placed upon all decisional law."[14] In *Crown Controls, Inc. v. Smiley*, 110 Wn.2d 695, 704-05, 756 P.2d

---

[12]*See, e.g., Clark v. Horse Racing Comm'n*, 106 Wn.2d 84, 92, 720 P.2d 831 (1986); *Baird v. Larson*, 59 Wn. App. 715, 720, 801 P.2d 247 (1990).

[13]*PUD 1 v. Kottsick*, 86 Wn.2d 388, 545 P.2d 1 (1976). *See also Barnett v. Buchan Baking Co.*, 108 Wn.2d 405, 408, 738 P.2d 1056 (1987) (attorney fees as consequential damages); *Stevens v. Security Pac. Mortgage Corp.*, 53 Wn. App. 507, 523-24, 768 P.2d 1007 (discussing award of attorney fees under the doctrine of equitable indemnification), *review denied*, 112 Wn.2d 1023 (1989).

[14]Catlett, *The Development of the Doctrine of Stare Decisis and the Extent to Which it Should Be Applied*, 21 Wash. L. Rev. 158 (1946).

717 (1988) (quoting *In re Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970)), we stated:

> When a certain legal principle has already been established in a jurisdiction, there is much to be said for its continued existence. The continuity of legal principles allows citizens to choose courses of action with a reasonable expectation of what the future legal consequences will be, even if those consequences might not arise for a considerable period of time. These interests, together with a desire to provide a society of laws and not of men, form the basis for the theory of stare decisis. . . .
> . . . *The doctrine requires a clear showing that an established rule is incorrect and harmful before it is abandoned.*

(Italics mine.)[15]

In *Olympic Steamship* there was *no* showing that the rule on attorney's fees was incorrect or harmful. There was *no* reason, compelling or otherwise, to depart from the rule. In fact, the issue was not even properly before this court. The briefs filed by the parties in *Olympic Steamship* did not even request the relief so broadly granted. After determining that a valid contractual basis existed for the award of attorney fees, the author of the majority opinion in *Olympic Steamship*, sua sponte — and by way of obiter dictum — proclaimed the following new rule:

> [A]n award of fees *is required* in any legal action where the insurer compels the insured to assume the burden of legal action, to obtain the full benefit of his insurance contract . . ..

(Italics mine.) *Olympic Steamship*, 117 Wn.2d at 53.

The only clear authority cited by *Olympic Steamship* is a 1986 West Virginia case, *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73 (W. Va. 1986). In rejecting both *Hayseeds* and *Olympic Steamship*, the Maryland Court of Appeals held that requiring attorney's fees to be paid by

> insurers, who breach their contracts by failure to pay covered benefits . . . would probably mark the elimination of the American rule as to contract actions against insurers generally and

---

[15]*See also State v. Collins*, 112 Wn.2d 303, 309, 771 P.2d 350 (1989) (Dore, J., dissenting) (stare decisis requires us to stand by our decisions unless there are *compelling* reasons why we should not do so).

leave in doubt the efficacy of the American rule as to other types of contracts.

*Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 17, 607 A.2d 537 (1992).[16]

While there are exceptions to the American rule,[17] none was applicable in *Olympic Steamship* and none is applicable here. There simply was no reasonable basis for *Olympic Steamship* to create a new exception to the American rule on attorney fees in this state. The *Olympic Steamship* decision violated our own rules on stare decisis and plays havoc with fundamental principles of our judicial system.

The rule of *Olympic Steamship*, which the majority applies here, was nothing short of legislating. We should leave any change in the basis for attorney fee awards in insurance cases to those whose job it is to legislate. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 249, 44 L. Ed. 2d 141, 95 S. Ct. 1612 (1975); Talmadge, 16 Gonz. L. Rev. at 74-75 (arguing that the American rule should be changed, but recognizing only legislative methods for accomplishing that change).

In the present case, unlike *Olympic Steamship*, there is no contractual basis for granting an award of attorney fees. I would thus deny fees and overrule *Olympic Steamship*.

DURHAM, J., concurs with ANDERSEN, J.

Reconsideration denied February 26, 1993.

---

[16]*See also Indiana Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085 (Ind. Ct. App. 1992) (rejecting the *Hayseeds* rule).

[17]*See, e.g., Barnett v. Buchan Baking Co.*, 108 Wn.2d 405, 408, 738 P.2d 1056 (1987).