[No. 41475-5-I.    Division One.    June 28, 1999.]

FIREMAN'S FUND INSURANCE COMPANY, *Appellant*, v. PUGET SOUND ESCROW CLOSERS, INC., ET AL., *Defendants*, DANIEL PARIS, ET AL., *Respondents*.

*Daniel F. Mullin* of *Abbott, Davis, Rothwell, Mullin & Earle, P.C.*, for appellant.

*Kevin Patrick Sullivan* of *Sullivan & Thoreson*; *Michael T. Schein*, for respondents Paris.

*John E. Gagliardi* and *Thomas Howard Fain* of *Fain,*

*Sheldon, Anderson & Vanderhoef, P.L.L.C.*; *Louis C. Roberts* of *Wison, Elser, Moskowitz, Edelman & Dicker,* for respondent Continental Ins. Co.

KENNEDY, C.J. — After Daniel and Pamela Paris obtained a default judgment against Puget Sound Escrow Closers, Inc., for damages resulting from an inadequately secured loan that the Parises made to Aquatic Ventures, Inc., a wholly owned subsidiary of Puget Sound Escrow Closers, Fireman's Fund Insurance Company, Puget Sound Escrow's errors and omissions insurer, filed a declaratory judgment action, seeking a ruling that it was under no duty or obligation to defend or indemnify Puget Sound Escrow for any liability, damages, settlement, or judgment arising out of the loan transaction between the Parises and Aquatic Ventures. The Parises then brought Puget Sound Escrow's fidelity bond insurer, Continental Insurance Company, into the action as a third party defendant.

On appeal, the Parises contend that the trial court erred in summarily dismissing Continental as a third party defendant, because they have a statutory right to garnish proceeds from Puget Sound Escrow's fidelity bond to satisfy their default judgment. Fireman's Fund contends on appeal that the trial court erred in denying its motion for summary judgment, because (1) Puget Sound Escrow's errors and omissions policy's "business enterprises" clause excludes any claims arising out of the loan transaction between the Parises and Aquatic Ventures; and (2) Puget Sound Escrow's errors and omissions policy covers only escrow services performed for a fee and, based on the evi-

dence in the record, a reasonable trier of fact could conclude only that no fee was paid to Puget Sound Escrow for services related to the loan transaction between the Parises and Aquatic Ventures.

We affirm the trial court's dismissal of Continental because Puget Sound Escrow suffered no "loss" as defined by the applicable statute and the fidelity bond; accordingly, Continental owes no garnishable debt to Puget Sound Escrow. We also affirm the trial court's denial of Fireman's Fund's motion for summary judgment. The business enterprises clause in the errors and omissions policy does not exclude the Parises' claims from coverage as a matter of law. Genuine issues of material fact remain regarding whether Puget Sound Escrow provided professional escrow services to the Parises. The provision in the policy limiting coverage to only those professional escrow services performed "for a fee" is unenforceable because it is contrary to public policy under the applicable statute.

## FACTS

In March 1993, Daniel and Pamela Paris agreed to loan $250,000 to Aquatic Ventures, Inc., a wholly owned subsidiary of Puget Sound Escrow Closers, Inc. As security for the loan, Aquatic Ventures promised the Parises the second lien position on a Seattle medical office building. According to the Parises, Aquatic Ventures represented that only one lender was on this property. Before completing the loan transaction, the Parises reviewed the preliminary title report and noticed three other prior deeds of trust on the medical office building, in addition to that of the primary lender. In the margins of the preliminary title report it was written that these three exceptions were "out" but the Parises nonetheless objected, insisting to Catherine Cooley, an employee of both Puget Sound Escrow and Aquatic Ventures, that the Parises receive the second lien position on the building. Cooley then left the room, returning a short time later with a letter on Puget Sound Escrow letterhead stating that Puget Sound Escrow indemnifies the

Parises that it had filed with the proper agency reconveyances of the three additional encumbrances. The letter was purportedly signed by Shawna Nichols, an employee of Puget Sound Escrow who previously had been introduced to the Parises as a Designated Escrow Officer of Puget Sound Escrow. Nichols later declared that she knew nothing of the March third loan transaction and that her signature on the letter was a forgery. Cooley swore in a subsequent affidavit that she witnessed Nichols sign the letter. Relying on this letter, the Parises handed over a personal check payable to Aquatic Ventures, Inc. for $250,000, and received back a promissory note and deed of trust on the medical building as security for the loan.

The three exceptions were never removed from the title. Shortly before September 18, 1995, the Parises learned that the holder of the largest of the three prior liens had filed a Notice of Default on his deed of trust. On September 18, 1995, the Secretary of State administratively dissolved Puget Sound Escrow.

On March 26, 1996, the Parises obtained a default judgment against Puget Sound Escrow for damages arising out of the loan transaction between the Parises and Aquatic Ventures. Findings entered in support of the judgment reflect both negligent misrepresentation and wrongful taking of funds for the personal benefit of two persons who were officers of both Aquatic Ventures and Puget Sound Escrow, Cooley and one Charles Fain, Jr., both of whom knew that the three exceptions had not been cleared and that the loan proceeds could not be delivered until Puget Sound Escrow had cleared these liens from the title to the medical office building.

On April 1, 1996, Fireman's Fund Insurance Company, Puget Sound Escrow's errors and omissions insurer, filed a declaratory relief action under chapter 7.24 RCW, seeking a ruling that it was under no duty or obligation to defend or indemnify Puget Sound Escrow for any liability, damages, settlement, or judgment arising out of the loan transaction between Paris and Aquatic Ventures. On April 2, 1996, the

Parises served a writ of garnishment on Continental Insurance Company, Puget Sound Escrow's fidelity bond insurer. Continental failed to respond to the writ of garnishment. On April 12, 1996, Aquatic Ventures filed for Chapter 11 bankruptcy protection.

On November 8, 1996, the Parises brought Continental into Fireman's Fund's declaratory relief action, as a third party defendant. On March 26, 1997, Continental moved to be dismissed from the third party complaint, contending that the Parises lacked standing to assert a claim under Puget Sound Escrow's fidelity bond. The Parises cross-moved for partial summary judgment against Continental, seeking a ruling that Puget Sound Escrow's fidelity bond represented a garnishable debt owed to Puget Sound Escrow by Continental. The Parises also moved for partial summary judgment against Fireman's Fund, seeking a declaratory ruling that Puget Sound Escrow's errors and omissions policy covered the Parises' losses. Fireman's Fund cross-moved for summary judgment, contending that Puget Sound Escrow's errors and omissions policy did not cover Paris "because there was *never an escrow set up* at Puget Sound Escrow Closers in which professional services could be rendered; *no fee was paid* as required for coverage under the policy, and any potential coverage would be *excluded under the self-dealing/joint ownership exclusion.*" Clerk's Papers at 325.[1]

The trial court granted Continental's motion to dismiss, which it treated as a motion for summary judgment, concluding that the Parises did not have standing to assert a direct claim under the fidelity bond issued to Puget Sound Escrow by Continental. The trial court certified the matter under CR 54(b). The trial court denied the Parises' motions for partial summary judgment, and denied Fireman's Fund's cross-motion for summary judgment. Fireman's Fund sought discretionary review of the trial court's denial

---

[1]For purposes of this appeal, Fireman's Fund concedes that there are genuine issues of material fact regarding whether Puget Sound Escrow set up an escrow account for the loan transaction between the Parises and Aquatic Ventures. Appellant Fireman's Fund's Br. at 4 n.1.

of its cross-motion for summary judgment. The Parises then filed a notice of appeal of the order dismissing Continental as a third party defendant, and notice of cross-appeal of the trial court's denial of its motion for partial summary judgment against Fireman's Fund. A commissioner of this court granted Fireman's Fund's petition for discretionary review, and ordered the appeals to proceed under the same cause number.

## ANALYSIS

I.  Has Puget Sound Escrow suffered a "loss" under its fidelity bond that created a (potentially garnishable) debt due to Puget Sound Escrow?

### Parises' Appeal

The Parises contend that the trial court erred in dismissing Continental from the third-party complaint, because "it is well-established that garnishment is permitted when the garnishee is indebted to the judgment debtor, and that a fidelity bond creates an indebtedness *as soon as the loss occurs*[.]" Cross-appellant Parises' Br. at 11. Continental maintains that the "fidelity policy does not represent a debt owed by [Continental Insurance] to [Puget Sound Escrow] that would be subject to garnishment." Respondent Continental's Br. at 7.

■ The Escrow Agent Registration Act specifically requires all escrow companies to obtain a fidelity bond "as evidence of financial responsibility[.]" RCW 18.44.050. Simply put, "[a] fidelity bond is an indemnity insurance contract in which the insurer for consideration agrees to indemnify the insured for loss 'arising from want of integrity, fidelity or honesty of employees or other persons holding positions of trust.' " *Estate of Jordan v. Hartford Accident & Indem. Co.*, 62 Wn. App. 218, 221, 813 P.2d 1279 (1991) (quoting *Commercial Bank v. St. Paul Fire & Marine Ins. Co.*, 175 W. Va. 588, 336 S.E.2d 552, 556 (1985)), *rev'd on other grounds by* 120 Wn.2d 490, 844 P.2d 403 (1993);

*see also* RCW 18.44.050 (statutory definition). "A fidelity bond indemnifies only against proven losses suffered by insured; it does not indemnify the insured against liability." *Estate of Jordan*, 62 Wn. App. at 221 (citing *Ronnau v. Caravan Int'l Corp.*, 205 Kan. 154, 468 P.2d 118, 122-23 (1970)); *see also* 44 C.J.S. *Insurance* § 8 (1993) ("The fact that insured may be liable to a third party for a loss of money resulting from employee dishonesty does not transform an employee fidelity policy covering insured against a direct loss into one indemnifying against liability.").[2]

■ Neither the Escrow Agent Registration Act nor Puget Sound Escrow's fidelity bond define "loss." But our Supreme Court has held that an escrow company suffered a "loss" under its fidelity bond when its employee diverted funds from an escrow trust account to the company's general operating account:

> [W]e conclude that Tinsley's embezzlement of $180,000 from the trust account constitutes a loss of funds that Lakeside held in its capacity as trustee of the escrow funds. The loss resulted in Lakeside being unable to fulfill its legal obligations as trustee, and that loss is a "loss" within the meaning of the statute and the bond.

*Estate of Jordan*, 120 Wn.2d at 499. The court's holding is consistent with the general rule that a loss occurs under a fidelity bond at the time an insured's employee misappropriates an insured's money or property:

> A "loss" occurs generally under an employee fidelity insurance policy when money or other covered property is misap-

---

[2]The Parises concede that they do not have standing to bring a direct claim against Puget Sound Escrow's fidelity bond: By the terms of RCW 18.44.050, which requires an escrow company to obtain a $200,000 fidelity bond, "a company issuing a fidelity bond to an escrow agent is liable only to the escrow agent, and not to third parties, in the event of a loss due to fraudulent or dishonest acts." *Estate of Jordan*, 62 Wn. App. at 223; *see also* 41 Am. Jur. 2d, *Indemnity* § 50 ("Generally, the only party entitled to sue on a contract of indemnity is the indemnitee or someone in his right. A third person, although he may have an interest in the subject matter of the indemnity and have a right of action against the indemnitee, is not entitled to sue on the indemnity contract in his own name."); *but see Anchor Equities, Ltd. v. Pacific Coast Am.*, 105 N.M. 751, 737 P.2d 532, 534 (1987) (holding that a third party may sue an insurer directly on a fidelity bond that was obtained to comply with state law).

propriated from the insured through employee dishonesty or fraud. "Loss" under such a policy does not require misappropriation plus a requirement that the insured pay the damages also sustained by a third party as a result of the misappropriation.

*Commercial Bank*, 336 S.E.2d at 556.

■ In the present case, however, the Parises do not allege that employees of Puget Sound Escrow misappropriated funds or property "from the insured." Rather, they allege that Puget Sound Escrow's employees fraudulently obtained the $250,000 loan *from the Parises* for the employees' personal benefit. Although Puget Sound Escrow is legally liable for its employees' malfeasance under the default judgment, Puget Sound Escrow has not suffered any losses to date. Therefore, unless Puget Sound Escrow were to make a payment to the Parises under the default judgment for its employees' wrongdoing, it will not have suffered a loss for which it can be indemnified under the fidelity bond:

> [I]f the employee's act caused damage to the third party because of the fraudulent misrepresentations of the insured's employee or because of breach of contract, then any judgment obtained by the third party against the insured is not a loss under the employee fidelity portion of the policy until the insured actually makes payment to the third party.

*Falcon v. Beverly Hills Mortgage Corp.*, 166 Ariz. 311, 802 P.2d 1010, 1016 (App. 1990) (citing *Commercial Bank*, 336 S.E.2d at 556; *Ronnau*, 468 P.2d at 123-24), *reversed on other grounds by* 168 Ariz. 527, 815 P.2d 896 (1991). Therefore, any proceeds that may result from a future claim against Puget Sound Escrow's fidelity bond are not yet garnishable:

> To support a writ of garnishment, the garnishee must be indebted to the principal debtor. If the policy is a liability policy, then such indebtedness exists as soon as liability is established, and may be reached by garnishment as any other credit belonging to the judgment debtor. If, on the other hand,

the policy be one of indemnity, the judgment debtor must first pay the judgment before he is entitled to maintain an action on the policy, and there is no indebtedness due him until he has paid the judgment; consequently garnishment cannot lie in favor of a judgment creditor, since his claim must be satisfied before there is anything due on the policy.

*Landaker v. Anderson*, 145 Wash. 660, 662, 261 P. 388 (1927); *accord* 1A KELLY KUNSCH, WASHINGTON PRACTICE: METHODS OF PRACTICE § 50.7, at 347-48 (4th ed. 1997).

The Parises argue that the Supreme Court's decision in *Estate of Jordan* stands for the proposition that the insured suffers a "loss" under its fidelity bond when a legal obligation results from the insured's employee's malfeasance: "Because of Tinsley's embezzlement, Lakeside was unable to fulfill its obligations as trustee. Lakeside thus suffered a loss in its capacity as trustee, and this loss is covered under the statute." *Estate of Jordan*, 120 Wn.2d at 497. But if this court were to so interpret *Jordan*, we would be treating fidelity bonds as liability—rather than indemnity—policies:

In the contract of indemnity against loss, the insurance company does not become liable until the insured has suffered a proven loss. In contrast, in the contract of indemnity against liability, the obligation of the insurance company becomes fixed when the liability attaches to the insured. . . . A fidelity bond is a contract of indemnity against loss.

*Central Nat'l Ins. Co. v. Insurance Co. of N. Am.*, 522 N.W.2d 39, 42 (Iowa 1994) (citations omitted). And, as the Supreme Court has noted, fidelity bonds are "contracts of indemnity." *Estate of Jordan*, 120 Wn.2d at 500 (quoting *White & Bollard, Inc. v. Standard Accident Ins. Co.*, 175 Wash. 174, 181, 27 P.2d 123 (1933)); *see also Estate of Jordan*, 62 Wn. App. at 221. Therefore, we reject the Parises' broad interpretation of *Jordan*, and hold that Puget Sound Escrow did not suffer an indemnifiable "loss"

under its fidelity bond that created a garnishable debt due to Puget Sound Escrow.

II. Does the "business enterprises" clause in Puget Sound Escrow's errors and omissions policy exclude the Parises' claims from coverage as a matter of law because the Parises' claims are based in fact on a loan transaction with Aquatic Ventures, a wholly owned subsidiary of Puget Sound Escrow?

### Fireman's Fund's Appeal

■ Fireman's Fund contends that the trial court erred in denying its motion for summary judgment because the business enterprises clause in Puget Sound Escrow's errors and omissions policy excludes any claims arising out of the loan transaction between the Parises and Aquatic Ventures:

This policy does not apply to:

. . . .

11. Any Claim arising out of or connected with the performance or failure to perform services for any person or organization:

   a. Which is owned by or controlled by any Insured;

   b. Which owns or controls any Insured;

   c. Which is affiliated with any Insured through any common ownership or control; or

   d. In which any Insured is a director, officer, partner or principal stockholder.

Clerk's Papers at 356. The Parises do not dispute that Puget Sound Escrow and Aquatic Ventures were part of the same business enterprise. They contend, however, that the business enterprise exclusion does not apply to the facts of this case, because their claim arises out of Puget Sound Escrow's failure to perform services to them, not to Aquatic Ventures.

■ "Interpretation of an insurance contract is a ques-

tion of law." *Daley v. Allstate Ins. Co.*, 135 Wn.2d 777, 783-84, 958 P.2d 990 (1998). "Courts interpret insurance contracts as an average insurance purchaser would understand them and give undefined terms in these contracts 'their plain, ordinary, and popular' meaning." *Id.* at 784 (citation omitted). Because coverage exclusions "are contrary to the fundamental protective purpose of insurance," they are "strictly construed against the insurer" and "will not be extended beyond their clear and unequivocal meaning." *Stuart v. American States Ins. Co.*, 134 Wn.2d 814, 818-19, 953 P.2d 462 (1998). "A strict application should not trump plain, clear language resulting in a strained or forced construction." *City of Bremerton v. Harbor Ins. Co.*, 92 Wn. App. 17, 21, 963 P.2d 194 (1998).

Fireman's Fund argues that the plain language of the business enterprises clause excludes *any* claim "arising out of or in connection with" a business entity in which Puget Sound Escrow has an interest. The Parises, on the other hand, contend that the clause can be reasonably interpreted as excluding *"only claims by affiliated entities in order to guard against collusion."* Respondent Parises' Br. at 15.

"The purpose of the business exclusion is predominantly to avoid collusive suits or the shifting of a business loss to a malpractice carrier." Steven B. Getzoff, *Insurance Coverage for Civil RICO Claims Against Professionals: The Impact of Recent Trends and Developments*, 28 TORT & INS. L.J. 504 (1993); *see also Jeffer v. National Union Fire Ins. Co.*, 306 N.J. Super. 82, 703 A.2d 316, 322 (App. Div. 1997). "In cases where those concerns are not present, the courts have interpreted this exclusion narrowly." Getzoff, *supra* at 504.

For example, in the often cited case of *Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C.*, 821 F.2d 216 (3d Cir. 1987), John Pepicelli, an attorney, owned all the shares in World of Tires, Inc. *Id.* at 217. World of Tires entered into an agreement with Perma Tread Corporation to purchase its tire recapping plant. *Id.* Under the agreement, "World of Tires obtained fire and hazard insurance

from American Insurance Corporation." *Id.* Before the transaction was completed, a fire destroyed Perma Tread's plant, and Perma Tread hired Pepicelli's law firm to recover its losses from American. *Id.*

After rejecting a settlement offer from American, Pepicelli's firm "filed suit against American, naming World of Tires as the plaintiff." *Id.* at 218. Perma Tread, represented by new counsel, attempted to intervene as a plaintiff in the fire insurance action, but a directed verdict was entered against it because its claim was time-barred under the fire insurance policy. *Id.* A jury entered a verdict in favor of American based on American's affirmative defense that World of Tires prepared a fraudulent proof of loss. *Id.*

Perma Tread initiated a malpractice action against Pepicelli's firm. The firm's malpractice insurer, Niagara Fire Insurance Company, then filed a declaratory judgment action, seeking a ruling that exclusions "f" and "g" of the firm's malpractice policy relieved Niagara Fire Insurance of its obligation to defend and indemnify Pepicelli's firm for the claims brought by Perma Tread:

> This policy does not apply:
>
>    * * *
>
> f) to any claim arising out of any insured's activities as an officer or director of any employee trust, charitable organization, corporation, company or business other than that of the Named Insured;
>
> g) to any claim made by or against or in connection with any business enterprise (including the ownership, maintenance or care of any property in connection therewith), not named in the Declarations, which is owned by any insured or in which any insured is a partner, or employee or which is directly or indirectly controlled, operated or managed by any insured in a non-fiduciary capacity[.]

*Id.* The Third Circuit, however, held that the exclusions did not apply, concluding that the exclusions were not intended to exclude Perma Tread's legal claims—notwithstanding

World of Tires' role in the factual background of those claims:

> [N]either of the exclusions that Niagara relies upon to disavow coverage applies to the malpractice claims at hand. Niagara points to exclusions "f" and "g." The insurer emphasizes two facts to support its argument of exclusion: 1) Pepicelli was and is "an officer or director" of World of Tires, and 2) the Law Firm, in its actions to collect the fire insurance claim, represented two clients—World of Tires and Perma Tread. These facts, however, do not bring Perma Tread's malpractice claims within either exclusion "f" or exclusion "g." Just as the district court did in reaching its decision, Niagara ignores the crucial distinction here: The exclusions speak of excluded claims, and thus the character of the specific legal claims, rather than the malpractice suit's general factual background, must be analyzed to determine the exclusion issue. The claims made by Perma Tread deal only with negligence and breach of contract in the Law Firm's representation of Perma Tread, and resolution of the claims will affect only the interests of Perma Tread and the Law Firm. Neither the actions nor the interests of Pepicelli in his business venture, World of Tires, are at issue in the malpractice suit. Therefore, the malpractice claims are not omitted from coverage by the two exclusions, "f" and "g," designed to exclude business risk and collusive suits from coverage under the policy.

*Id.* at 220.

Likewise, in this case, there is no suggestion that the Parises engaged in any kind of collusion with Aquatic Ventures or Puget Sound Escrow to shift business losses to Fireman's Fund. Moreover, the Parises' claims against Puget Sound Escrow arise out of and are connected with Puget Sound Escrow's failure to remove three senior liens from the medical office building's title, not Aquatic Ventures' alleged misappropriation of the loan proceeds. Therefore, although Aquatic Ventures played a prominent role in the factual background of the Parises' claims against Puget Sound Escrow, the business enterprises clause in Puget Sound Escrow's errors and omissions policy does not exclude the Parises' claims from coverage under the policy.

III. Assuming that no fee was paid to Puget Sound Escrow, does the fee requirement in Puget Sound Escrow's errors and omissions policy exclude the Parises' claims from coverage as a matter of law—notwithstanding the Escrow Agent Registration Act's requirement that escrow agents obtain errors and omissions insurance to regulate escrow agents for the benefit of the public?

█ Fireman's Fund also contends that the trial court erred in denying its motion for summary judgment because Puget Sound Escrow's errors and omissions policy covers only escrow services performed for a fee: "The insurance afforded by this policy applies solely to wrongful acts in the insured's performance of professional services for others for a fee as [an] Escrow Agent." Clerk's Papers at 353. The Parises counter that the fee requirement cannot defeat coverage because it conflicts with the Escrow Agent Registration Act's requirement that escrow agents engaged in the business of performing escrow services for compensation obtain "coverage for unintentional errors and omissions of the escrow agent and its employees[.]" RCW 18.44.050.

█ "Washington courts will not enforce limitations in insurance contracts which are contrary to public policy and statute[.]" *Cary v. Allstate Ins. Co.*, 130 Wn.2d 335, 339-40, 922 P.2d 1335 (1996). "[T]he overall purpose of the [Escrow Agent Registration] Act is to regulate escrow agents for the benefit of the public." *Estate of Jordan*, 120 Wn.2d at 498. To carry out its purpose, the Act requires agents engaged in the business of providing escrow services for compensation to obtain, "as evidence of financial responsibility," an insurance policy that provides "coverage for unintentional errors and omissions of the escrow agent and its employees[.]" RCW 18.44.050.

Although a fee requirement does not expressly contradict the Escrow Agent Registration Act, it does frustrate the policy behind the Act's requirement that escrow agents obtain errors and omission insurance, i.e., "to regulate

escrow agents for the benefit of the public." *Estate of Jordan*, 120 Wn.2d at 498. That is, if errors and omissions coverage can be conditioned on the payment of a fee, a significant number of escrow transactions could be excluded from coverage. For example, an escrow agent might provide escrow services without a fee to expand its client base or as an accommodation for a repeat customer. The customers of such transactions would and should expect the same protection as any fee-paying customer, but would not be protected by the escrow agent's errors and omissions policy if it contained an enforceable fee requirement.

■ Of course, to make a claim under an escrow agent's errors and omissions policy, the claimant must still establish that the escrow agent provided "professional escrow services." And whether a fee was paid or not may be evidence of whether the escrow agent provided such professional escrow services. In this case, however, Fireman's Fund concedes that there are genuine issues of material fact regarding whether Puget Sound Escrow provided escrow services for the loan transaction between the Parises and Aquatic Ventures. Appellant Fireman's Fund's Br. at 4 n.1. Therefore, even assuming that no fee was paid to Puget Sound Escrow in connection with the loan transaction between the Parises and Aquatic Ventures, the trial court did not err in denying Fireman's Fund's motion for summary judgment.

In summary, we affirm the trial court's dismissal of Continental Insurance Company from the lawsuit and we affirm the trial court's refusal to rule on summary judgment that Fireman's Fund's errors and omissions policy excludes coverage of the Parises' claims as a matter of law, based on either the business enterprises clause or the clause limiting coverage to those escrow transactions for which a fee is paid. Whether the Parises' claims are covered depends upon the resolution of the genuine issues of material fact regarding whether Puget Sound Escrow Closers, Inc., provided professional escrow services to the Parises.

A GID and E LLINGTON, JJ., concur.